1                    UNITED STATES DISTRICT COURT
                        DISTRICT OF KANSAS
2

3    JUSTIN BERBERICH,                )
                                      )   Case No. 22-02426-EFM
4       Plaintiff,                    )   Circuit No. 24-3154
                                      )
5       v.                            )   Kansas City, Kansas
                                      )   Date:  June 26, 2024
6    KANSAS CITY SOUTHERN             )
     RAILWAY COMPANY,                 )
7                                     )   (Pages 1 - 119)
        Defendants.                   )
8

9

10                         TRANSCRIPT OF
                        PRETRIAL CONFERENCE
11
                 BEFORE THE HONORABLE ERIC F. MELGREN
12                UNITED STATES DISTRICT COURT JUDGE

13

     APPEARANCES:
14

     For the Plaintiff:
15

             Nicholas D. Thompson     Steven L. Groves
16           Casey Jones Law Firm     Groves Powers, LLC
             1330 Lagoon Avenue       1 US Bank Plaza
17           4th Floor                505 North 7th St., Suite 2010
             Minneapolis, MN 55408    St. Louis, MO 63101
18

19   For the Defendants:

20           Douglas R. Dalgleish
             Courtney Harrison
21           Anna Turner
             Stinson, LLP-KC
22           1201 Walnut Street, Suite 2900
             Kansas City, MO 64106
23

24   _____
          Proceedings recorded by machine shorthand, transcript
25          produced by computer-aided transcription.

22-02426      Berberich v KCS_Pretrial      06.26.24      2

```
 1      (Court called to order.)
 2          THE COURT:  Counsel, you may know this, this is what's
 3  called the Tenth Circuit courtroom.  Not that they ever use it.
 4  It's absurdly large.  I have all these benches up here.  I'll
 5  only be using one of them.  That's where we are.
 6          Do you know, John, is this where we're set for trial
 7  as well?
 8          THE COURTROOM DEPUTY:  I believe so.
 9          THE COURT:  All right.  Very good.
10          The Court calls the case of Justin Berberich versus
11  Kansas City Southern Railway Company, Case No. 22-02426.
12          Let's start with appearances, please, if we could.
13          MR. THOMPSON:  Nick Thompson and Steve Groves appear
14  for the plaintiff, Your Honor.
15          MR. GROVES:  Good morning, Your Honor.
16          THE COURT:  And which are you?
17          MR. THOMPSON:  Nick Thompson.
18          THE COURT:  All right.  Thank you.
19          MR. DALGLEISH:  Good morning, Your Honor.
20          I'm Doug Dalgleish with Stinson for the defendant.
21  I'll let my colleagues --
22          THE COURT:  You're Doug?
23          MR. DALGLEISH:  Yes.
24          THE COURT:  All right.  Thank you.
25          MR. DALGLEISH:  I'll let my colleagues introduce
```

3

```
 1    themselves.
 2            MS. HARRISON:  Courtney Harrison on behalf of
 3    defendant.
 4            MS. TURNER:  And Anna Turner on behalf of defendant.
 5            THE COURT:  Very good.  Thank you.
 6            Who's going to be taking the lead, if there will be
 7    particularly one person for each side?
 8            MR. THOMPSON:  Nick Thompson for the plaintiff,
 9    Your Honor.
10            THE COURT:  All right.
11            MR. DALGLEISH:  Your Honor, Doug.  I will be lead.
12    Although we have actually kind of divided up some of these
13    issues.
14            THE COURT:  That's perfectly fine.
15            So we've got a number of matters to go through.  I
16    typically start with just some preliminary matters with respect
17    to the trial and whatever else.  We're scheduled to start trial
18    next week, Monday morning.  Which we held to this -- or we
19    firmed up this trial schedule.
20            I know my chambers contacted you to make clear that we
21    only have three days for trial.  Nobody seemed concerned about
22    that.  I'm not particularly concerned about that.  Of course,
23    July 4th is a holiday.  We're government employees so we're
24    taking July 5th off as well.  The following week I have other
25    things.  So we'll obviously need to be done by Wednesday.
```

1  Again, I don't anticipate a problem.

2          I'll start trial at 9:00.  We'll go a full day.  I, of

3  course, taking morning, afternoon, and noon recesses.  My

4  preference is, as we approach those times -- roughly 10:15 or

5  10:30 for the morning recess.  Roughly noon for lunch.  Roughly

6  3:00 for the afternoon recesses.

7          As we approach those times, my preference is,

8  whichever attorney may be examining at that point, when they're

9  at a natural break in their examination, would say, Judge, this

10 might be a good time for a break.

11         Rather than me sort of jumping in when you're two

12 questions from finishing up a subject matter or something.

13 You'll know far better than I will when an actual break is.  So

14 if you'll just tell me when that is, that's what we'll do.

15         If it appears that you're so into your examination

16 that you've forgotten the clock, I will intervene.  I prefer not

17 to do that.  I typically only take about an hour and a quarter

18 for lunch.  Again, just to kind of keep things moving along.

19         *Voir dire*, of course, in federal court, we seat a jury

20 of eight.  Each side has three preemptory challenges.  So

21 inquire of a panel of 14.  I'll do the initial *voir dire*.  I

22 think I've indicated I will give each of you half an hour to do

23 your own following that.  You know the rules, don't argue your

24 case in *voir dire*.

25         It's more about examining the jury than -- I had an

1   attorney -- maybe, perhaps, my first trial I did as a judge.

2   Before I, perhaps, developed more self-confidence than I have

3   now -- who essentially did an extended opening statement during

4   his *voir dire*.  I won't make that mistake twice.  Anyway, we all

5   know that.

6           When you wish to make a motion to strike for cause, I

7   prefer that you do it up at the bench.  I'll tell you -- and

8   this is only experientially, it's not in any way impeding your

9   rights to make motions to strike for cause.  It's been my

10  experience over the last several years that the lion's share of

11  cause strikes that may come up, come up during my own

12  examination.  And so I end up sort of doing a lot of those on my

13  own, if you will.

14          But here's the danger of that.  It may become apparent

15  as I'm examining a juror that I'm kind of drilling down on an

16  issue because I'm concerned whether there's a reason to strike

17  them for cause.  And then it may become apparent that I'm

18  satisfied that they're good.  And I'm ready to move on.

19          But if you're not satisfied, what I'd prefer is that

20  we go ahead and finish that topic at that moment.  So if I've

21  examined a juror that you also have concerns about, it looks

22  like I'm satisfied and want to move on but you'd like to ask

23  some more, stand up and interrupt me.  And say, Judge, may we

24  examine the prospective juror a little bit more.

25          I'll try to remember to ask you if you want to examine

1  them when I'm done, but if I don't and I'm moving on, rather

2  than you picking it up later, I'd prefer that you just interrupt

3  me, and say, can we examine a juror a little bit more.

4        Then as I said, let's do cause strikes at side bar.

5  Where is side bar?  Straight down there, I guess.  Is that where

6  the court reporter's mic is going to be?  This courtroom's

7  massive.  Anyway, we'll do it there.

8        When we do preemptory strikes, my courtroom deputy,

9  which is probably going to be my law clerk, Mr. Ralston, will

10  pass a strike -- I guess during jury selection, Ms. McKey will

11  be here, won't she?  All right.  My courtroom deputy -- my

12  actual courtroom deputy will be with us during jury selection.

13  She won't be with us during the trial, Mr. Ralston will be.

14        Anyway, she'll pass a strike sheet back and forth

15  between the tables, rather than have you stand up and announce

16  your strike.  I don't know that the juror particularly needs to

17  know whom struck whom.  She'll pass back and forth between the

18  tables.  And after the last side has made its strike, she'll

19  show that strike to the other side.

20        If you have any reasons to object or challenge to a

21  preemptory strike -- and I don't know what there would be other

22  than a Batson challenge, you'll need to raise it has no later

23  than that time.  Once we announce who the final eight jurors are

24  going to be, any challenges that you might have had to the other

25  side's preemptory will be considered waived.

```
1              I guess I should note, y'all know this, we seat eight
2     jurors.  If all eight survive to deliberation, they all
3     deliberate, but six can return a verdict.  If we somehow, in
4     three days, manage to lose three jurors, which would be a
5     record, the six can go ahead and deliberate.  Typically, all
6     eight deliberate.
7              This is not a complicated case.  I'm going to give you
8     20 minutes a side for opening statements.  There are two or
9     three things that I do -- have started doing in the last several
10    years a bit differently than normal.  A lot of attorneys have
11    been kind of appalled at it at the front end.  Most, probably
12    not all, have ended up saying they liked it on the backside.
13             One of it is, I give instructions to the jury before
14    we start.  I think I've notified of you of that.  The jurors
15    really like that.  I mean, you know, most jurors -- we have very
16    few repeat jurors.  It's the only experience they know.  I talk
17    to them and visit with them after the trial, and I say,
18    traditionally, these instructions are given afterwards, how did
19    you feel about getting them on the front end?
20             It really kind of gives them an idea of what they're
21    looking for.  I've -- after trials, as we've collected items up
22    behind the jury room, I've noticed some jurors have made notes
23    on their instruction sheets.  I think they find it helpful.
24             One potential problem with that -- and I'll acquaint
25    the jurors with this is, that to the extent the case narrows
```

22-02426    Berberich v KCS_Pretrial    06.26.24    8

1    from the start of the trial before the end, I may have to come

2    back and tell the jurors, all right, I've, with the attorneys,

3    decided we're removing, whatever claim.  And so my courtroom

4    deputy is now going to collect certain jury pages from you.  If

5    you'd all take page 17 out.  It's not longer relevant.

6          I mean, we may have to make some adjustment to it on

7    the ongoing thing.  It's not happened a lot, but it can happen

8    occasionally.  Overall, I think it helps the jurors a lot to

9    follow the case.

10          The other thing I do -- and this really strikes fear

11   and loathing in the hearts of attorneys, is I let the jurors ask

12   questions.  And I should say I intend to because the last trial

13   that I did, I told the attorney, and then at the start of the

14   trial I told the jurors that I'd let them ask questions after

15   each witness, then I forgot to ever do it.

16          So my law clerk is going to throw a heavy object at me

17   if I forget to do that.  The jurors will have written forms in

18   their jury notebooks.  After each witness, I'll ask them to

19   write proposed questions on the form.  I'll ask them to hand in

20   the form whether they have a question on it or not.

21          I'll look through them and quite likely visit with you

22   before I ask them.  Unless it's something very simple, but in

23   the event that there's something -- if it's just, could you

24   repeat the numbers again that this witness gave.  But I'll try

25   to visit with you if I think there's any possibility that the

1    questions might be suspect.

2         When I started this, I was convinced that the

3    overwhelming amount of questions I'd get would be inappropriate

4    to ask.  My experience has been quite the contrary.

5    Occasionally, they submit a question that -- that I can't ask.

6    And I tell them, I've got a question here I can't ask and I'm

7    sorry.  But by and large, their questions have been on point and

8    appropriate.

9         The attorneys have really liked having a sense as they

10   go along with what the jurors are picking up on.  What they're

11   thinking about.

12        So we'll do direct, cross, redirect, recross.  I'll

13   ask the jurors to submit questions.  And after I've asked

14   whatever juror questions are asked, I'll give both sides one

15   more round to follow up, just on those jury questions for

16   witness examination.

17        So when transcripts of a trial are prepared, the

18   parties are responsible for redacting personal identifier

19   information.  I found the easiest way to redact that is to not

20   put it in there to begin with.

21        There's no reason in this case to ask residential

22   addresses.  You can certainly ask cities.  And I'll do that with

23   the jurors themselves.  I don't want street address, just the

24   city they live in.  Certainly, there's no reason in this case to

25   ask other personal identifier information.  So just encourage

1   you to keep an eye out.

2          We don't have a lot of witnesses in this case, but are

3   either side wanting to invoke evidentiary Rule 615 to exclude

4   witnesses prior to testimony?

5          MR. THOMPSON:  Not from plaintiff, Your Honor.

6          MR. DALGLEISH:  Yes, Your Honor.

7          THE COURT:  All right.  Well, we'll do that.

8          Once a witness has testified, I'm going to consider

9   the exclusion satisfied.  And in the event they want to stay and

10  watch, they can.  If, however, you think that they may be

11  recalled and you would like the exclusion to remain intact,

12  you'll need to notify me of that at that point.

13          And additionally, I'll instruct the witness to leave,

14  but absent that particular issue, I'm going to lift an exclusion

15  from -- from them once they've testified.

16          During the trial I don't require you to chain yourself

17  to the podium.  I have found that it's very helpful if the court

18  reporter can hear you.  So as long as you're being able to be

19  heard by the court reporter when you're away from the mic,

20  that's fine.  Obviously, you can't go camp out on the jury box

21  and lean on the rail and pass out Valentine's.

22          Otherwise, if you need to or want to roam a bit

23  through the well of the court during your examination, I'm fine

24  with that.  Again, so long as the court reporter can hear you.

25          I also, in a trial like this, don't require attorneys

1    to ask permission to approach the witness.  In my experience

2    none of you will be able to help yourself.  You'll do it anyway,

3    and that's fine.  I don't particularly require that.  I don't

4    think it's necessary with anything I need to concern -- anything

5    I need to be concerned about.

6            So because I'm instructing before the trial starts, at

7    the end of the trial, we won't have instructions, except as

8    you've noticed to my draft instructions that I've circulated,

9    they're -- I don't remember, maybe, four instructions that are

10   logistical that I give at the end.

11           Once the case is concluded, we'll hear closing

12   argument to each side, and then I'll have those logistical

13   instructions that I'll give to the jury.  Just as to their

14   process in deliberating, but that's all that will need to be

15   taken up.

16           Logistically, that's all I know to discuss.  Do y'all

17   have any questions on procedural logistics before we get into

18   motions in limine and other issues?

19           MR. THOMPSON:  No, Judge.

20           MR. DALGLEISH:  Couple short, logistical ones,

21   Your Honor.

22           THE COURT:  Of course.  By the way, I -- I typically

23   prefer to do these limine conferences around my conference room.

24   We kind of quit that after COVID.  I'm usually kind of reluctant

25   to wear a robe in these.

1              My point is, you don't have is to stand during the in

2     limine conference.  I think that we're kind of all sitting

3     around a conference room and chatting a case.  So keeping it

4     informal.  Anyway, go ahead.

5              MR. DALGLEISH:  Yeah.  Just checking to see, I think I

6     may have forgotten to bring her, but our paralegal would like to

7     get hooked up and connected to do electronic display of

8     exhibits.  Is that -- is there a convenient time for her to do

9     this, given this is not your regular courtroom?

10             THE COURT:  Yes.  Of course, neither of my law clerk

11    or I are normally from this courthouse.  And my own courtroom

12    deputy will be coming up from Wichita to help us with that.

13    You're wanting access to the courtroom prior to the start of

14    trial next week to do that?

15             MR. DALGLEISH:  If it's -- if it's convenient.

16             THE COURT:  We can certainly make that happen.  Why

17    don't you talk to Mr. Ralston at the end, and we'll find someone

18    to contact you and schedule a time for them to come in.

19             MR. DALGLEISH:  Okay.  It's not a --

20             THE COURT:  No, it's not an unusual request.  It's

21    just -- until recently when I did trials up here, I used a

22    courtroom deputy from Kansas City to help me.  Congress keeps

23    giving us less money so we don't have extras.  We'll find

24    someone up here to do that.  That's not unusual.

25             MR. DALGLEISH:  Okay.  And I should offer, since you

1   all are from out of town, we can have her display your exhibits

2   too if you want or you can have somebody set up.  It's not a

3   heavy-document case, I don't think it would be a big deal.

4              MR. THOMPSON:  Appreciate it.

5              MR. DALGLEISH:  I think that's the only logistical

6   thing.  Other than, what time do you want us here on Monday?

7              THE COURT:  The jury will report, probably, 8:00,

8   which I think is the earliest they can get into the building,

9   for some basic juror orientation and information before they

10  come up here.  So given that 9:00's really the earliest we can

11  start, and it may be -- start jury selection, and it may be a

12  tad after that.

13             Nevertheless, if you all could be here at 8:45.  I

14  just know there's a high likelihood over the weekend that some

15  other matter comes up that we need to take up.  If not, we'll

16  just smile and wave at each other and wait for the jury.  Why

17  don't you be here at 8:45, I'll be here at the same.  That way

18  we have a moment to take something up if we need to.

19             MR. DALGLEISH:  Your Honor, will we have the jurors'

20  information sheet such as they are at 8:45, if we're here then?

21             THE COURT:  So you should be able to get, from our

22  jury clerk, now -- today's only Tuesday.  Maybe in a day or two.

23             THE COURTROOM DEPUTY:  Wednesday.

24             THE COURT:  It's Tuesday when I came up last night.

25  So today's only Wednesday.  Maybe today or tomorrow you can get,

```
 1   from our jury clerk, the actual names of the jurors who are

 2   being called in.

 3              MR. GROVES:  Would that be the jury clerk for this

 4   courthouse?

 5              THE COURT:  For this courthouse, right.  And then what

 6   I try to do is -- you'll, of course, get a list of all the

 7   prospective jurors organized alphabetically, but because we sort

 8   these by computer, I try to have my courtroom deputy prepare an

 9   initial seating chart that will show who the first 14 are,

10   already typed in on a seating chart for you before they start.

11              And by the same token, the jurors downstairs in the

12   jury room will be told, Ms. Smith, you're Juror Number 1,

13   Mr. Jones, you're Juror Number 2.  And we'll have numbers taped

14   on the bench -- on the juror chairs.  So when they come up,

15   they'll go straight to the chair and we don't start with the

16   old, traditional, call the jury.

17              We sort them randomly.  We know who they are before we

18   get here.  I decided several years ago we could kind of dispense

19   with that action.

20              MR. DALGLEISH:  I think that's all.

21              THE COURT:  Any other questions?

22              MR. THOMPSON:  Yeah, Judge, sorry.  I did have one

23   administrative thing.  My associate, Kathryn Averwater --

24              THE COURT:  I'm having trouble hearing you, counsel.

25   I'm sorry.
```

```
 1            MR. THOMPSON:  My associate, Kathryn Averwater, who

 2   was noticed on appearance, was going to try the case with me.

 3   She was unable to make it.  She had family stuff in Boston.

 4   She's not going to make it to the pretrial conference.  If that

 5   means she can't participate, we understand.

 6            THE COURT:  Is she going to examine witnesses or she's

 7   going to assist you in the --

 8            MR. THOMPSON:  No, she was going to question

 9   witnesses.

10            THE COURT:  Okay.  Of course, we have so few witnesses

11   in this case.  There's not a whole lot of them.  She'll be here

12   next week?

13            MR. THOMPSON:  She would, Your Honor.

14            THE COURT:  All right.  I strongly prefer that the

15   juror -- I mean, the attorneys who are going to participate in

16   the trial be present for this conference.  I don't anticipate a

17   lot of problems in this case of that nature.

18            If you acquaint her with what she needs to know, and

19   that's mostly to avoid embarrassment during the trial, we'll go

20   ahead and let her do that if she's prepared for it.

21   Particularly, with young attorneys who are getting trial

22   experience, I hate to deny that to them.

23            MR. THOMPSON:  I appreciate it, Judge.  Thank you.

24            THE COURT:  I want to give them chances.

25            Anything else?
```

1          MR. DALGLEISH:  No, Your Honor.

2          THE COURT:  Let's -- I think what we'll do is we'll

3    take up our motions in limine.  We'll take up witness

4    objections, witness and exhibit objections, to the extent we can

5    do anything with exhibit objections.  We'll go through our

6    instructions.  I guess that should be it.

7          So I guess, plaintiff, you do not have any motions in

8    limine?

9          MR. THOMPSON:  That's correct, Your Honor.

10         THE COURT:  All right.  So I'm going to start with

11   Docket 66, which is defendant's motions in limine.  I've looked

12   at plaintiff's responses to those.  And as is typical, a lot of

13   these are not particularly going to be contested, but let's work

14   through them.

15         Defendant's first motion in limine is -- you know what

16   I think I'm going to do, before I start into these -- there

17   seems to be some confusion, maybe even on counsel's side, but I

18   think certainly kind of on the Court's side, as to precisely

19   what claims plaintiff is going -- planning to go forward with in

20   this case, based on what's happened, based on my prior rulings,

21   based on some discussion in the pretrial filings.

22         I think it might be helpful, even before we start with

23   this, Mr. Thompson, Mr. Groves, if you could give us a brief

24   statement of what you believe are the claims that you're

25   submitting to the jury in this case.  Just so that we're clear

1    because I think there's a little bit of confusion on that.

2         MR. THOMPSON:  Plaintiff's claim is that defendant

3    violated the Federal Railroad Safety Act by noticing to an

4    investigation, and then assessing points against him after that

5    investigation, due to him attending a hearing in the

6    administrative law forum --

7         THE COURT:  You're not actually claiming that

8    defendant violated the law by noticing him to an investigation,

9    just by assessing points because he went to the investigation;

10   am I correct on that or do you think even the notice was a

11   violation of law?

12        MR. THOMPSON:  The law is very clear that for the

13   FRSA, it has a lower standard for adverse action.  So even just

14   the noticing to an investigation is an adverse action under the

15   law.  That being said, since they -- since they did issue him

16   points, it doesn't really matter.  We can focus just on the

17   issuance of points.

18        THE COURT:  All right.  And the points -- and that's

19   all you're objecting to, is the issuance of points for his

20   absenteeism, correct?

21        MR. THOMPSON:  That's correct.

22        THE COURT:  My recollection is that there were either

23   12 or 14 days that he missed during the relevant time period.

24   And I guess I have some confusion as to whether all of those

25   absences were related to his involvement in the investigation or

```
 1    whether that's a mixed bag.

 2            MR. THOMPSON:  Yeah, they are not.  I understand

 3    that's going to be the defendant's claim.  So the defense

 4    witness, we understand, is going to say, look, I would have

 5    disciplined or assessed the points even if he had not missed

 6    work for that hearing because he missed enough work for other

 7    things.

 8            However, there's no policy that says that -- they've

 9    identified no comparators who have been disciplined at that

10    number of absences without those extra days.  We don't dispute

11    though that the other days are not protected.  So we are just

12    talking about the days he missed for the hearing.

13            THE COURT:  So how many days did he miss during the

14    relevant time period?  I want to say 14; is that correct?

15            MR. THOMPSON:  I'm not sure, Judge.  I'd have to look.

16    I don't have --

17            THE COURT:  How many of those days were for his

18    involvement in the administrative hearing?

19            MR. THOMPSON:  I don't have that in front of me,

20    Judge.

21            THE COURT:  So defendant, my -- do you know the math?

22            MR. DALGLEISH:  Yes, sir, I do.

23            THE COURT:  All right.

24            MR. DALGLEISH:  So he missed 14 days.

25            THE COURT:  That's what I thought.
```

1          MR. DALGLEISH:  And as -- in connection with the

2   internal investigation, he proffered a letter from his lawyer

3   saying, I need him off these days for the -- for the hearing.

4   So they took those two days off.

5          THE COURT:  And there were only two days --

6          MR. DALGLEISH:  Only --

7          THE COURT:  -- that he -- that were identified as to

8   the hearing?

9          MR. DALGLEISH:  Within the ambit of what he was

10  charged, yes.  So that took him from 14 to 12.  And so our

11  position is --

12         THE COURT:  And so if I understand defendant's

13  position, you're not counting those two days against him?

14         MR. DALGLEISH:  Correct.

15         THE COURT:  So given that -- if defendant's math is

16  correct, given that plaintiff missed 14 days, two of those

17  were -- this brings back unpleasant memories from sixth grade --

18  excused absences from work.

19         And defendant's position is that he's being sanctioned

20  only for the other 12.  Is his involvement in the administer --

21  let me put it this way.  To what extent, plaintiffs, do you

22  think his involvement in the administrative hearings are

23  relevant to your claims against defendant?

24         MR. THOMPSON:  Yeah.  So the defendant says -- or the

25  witness says, I didn't consider these two days, but there is no

1   evidence of that at all.

2         THE COURT:  Well, what evidence would there be?

3         MR. THOMPSON:  Did they discipline other people at

4   only 12 days and not 14?  That would be an example.

5         THE COURT:  Okay.

6         MR. THOMPSON:  A letter or note saying, I'm not

7   including these days.  Something saying that.  There is no

8   evidence.  It's just his word -- I didn't count those days.

9   There is no contemporaneous or other evidence of that.  We

10  dispute that.  Which is --

11        THE COURT:  You dispute that they didn't count those

12  other two days?

13        MR. THOMPSON:  Correct.

14        THE COURT:  What, if any, allegations are you making

15  with respect to the 12 days that were not related to the

16  investigation?

17        If I understand -- and, again, I'm a bit foggy on

18  this, you're not claiming those were excused absences per se,

19  but you're claiming that assessing him points for the 12 days

20  was action that defendants had never taken against someone else.

21  Is that likely correct?

22        MR. THOMPSON:  Yes, with an asterisk.  It's mostly

23  correct.  The asterisk is this.

24        THE COURT:  All right.

25        MR. THOMPSON:  His other days are actually at issue in

1  another lawsuit.

2        THE COURT:  But we're not really going to talk about

3  that.

4        MR. THOMPSON:  We are not, but to say that there are

5  unexcused absences is also unfair because they are -- it's a

6  different violation of a different law.  It's a different --

7        THE COURT:  So -- and this is -- I've read this, but

8  remind me, this is sort of a class action thing relating to --

9  is it FMLA?

10        MR. THOMPSON:  That's right.

11        THE COURT:  And that's pending somewhere else.  And

12  we're not going to try those issues here, but were some of those

13  12 days -- is there evidence that some of those 12 days related

14  to his assistance to the FMLA investigation?

15        MR. THOMPSON:  Not to the existence of the FMLA

16  investigation, but that he would have had FMLA, and they

17  wouldn't have counted against him absence --

18        THE COURT:  Oh, oh.  So you're not claiming -- you're

19  not claiming that the other 12 days were to assist in other

20  investigations, but you're claiming that other investigation

21  should have exonerated him for some of those other 12 days?

22        MR. THOMPSON:  Yes.

23        THE COURT:  That's going to be resulted in a different

24  lawsuit.

25        MR. THOMPSON:  That's at issue in a different lawsuit.

1  We just don't want the jury being left to be thinking that this

2  guy is, you know, sitting around the house, doing whatever he

3  wants, not showing up to work.  That's just simply not true.

4          THE COURT:  So how do you intend to approach that?

5          MR. THOMPSON:  Frankly, we'd like the Court's guidance

6  on that.  One thing is to just tell them, simply, what we've

7  discussed here, that --

8          THE COURT:  What we've discussed here involves another

9  investigation, another trial --

10         MR. THOMPSON:  It does.

11         THE COURT:  -- which we're not going to get into.

12         MR. THOMPSON:  Right.  And I think we just tell the

13 jury that, that the legitimacy of some of those absences is a

14 question in another lawsuit that is not before you.  You should

15 just take those other absences as a given.  You don't need to

16 speculate as to whether they were with permission, without

17 permission.  That is not before you.  Those ones are a given.

18         THE COURT:  Defendant, what do you -- how do you think

19 we should address these other 12 days?

20         MR. DALGLEISH:  Well, I think --

21         THE COURT:  Can you make sure you're on the mic?

22 Thank you.

23         MR. DALGLEISH:  Yes.  I'm sorry.

24         We've just got a little philosophical difference here

25 based upon how they pled the case and what the pretrial order

1    says.  So here's our view:  It started at 14 days.  They had the

2    investigation.  They took off the two days --

3              THE COURT:  Who's they?

4              MR. DALGLEISH:  The company.  The company took off the

5    two days --

6              THE COURT:  KCS?

7              MR. DALGLEISH:  KCS.

8              THE COURT:  All right.

9              MR. DALGLEISH:  KCS removed the two days that his

10   lawyer asserted were related to the investigation, okay?  The

11   other days are not disputed that he was absent from work.  So we

12   believe he's absent from work 12 days.  The standard they apply

13   is ten.  There's the case.

14              They have challenged --

15              THE COURT:  Say that last thing again.  What -- what's

16   ten?

17              MR. DALGLEISH:  The standard which the -- which KCS

18   utilizes, and there's been testimony on this, is that if you're

19   absent ten days in the 90-day window, that's subject to

20   discipline.

21              THE COURT:  Ten days or more than ten days?  Doesn't

22   really matter, I guess, for our case.

23              MR. DALGLEISH:  Ten or more.

24              THE COURT:  Okay.

25              MR. DALGLEISH:  It kind of doesn't matter because --

1    well, in our view it doesn't matter because after he got the

2    days for the hearing removed, he was still at 12.

3              THE COURT:  Right.

4              MR. DALGLEISH:  And over the ten days.  And that's why

5    discipline was offered.  That's the evidence that we would

6    intend to offer.  I'm -- I'm not clear exactly what plaintiff is

7    trying to say about the other days because it's just -- it's

8    just a fact, he missed those days.

9              And they tied their case, this case, to a challenge of

10   the labor hearing only, not the FMLA.  That's what they pled in

11   their complaint.  And that's what's in the pretrial order.

12             So our world view is that he missed those days, those

13   other days.  And we'll be able fight it out on what the issue is

14   with regard to the hearing, but those days were removed too,

15   which is why we're a little puzzled what the cause of action is.

16             THE COURT:  That's why I'm having this discussion.

17             So just between us, why did -- not that this is going

18   to come up in trial, but to help me get my mind around this, why

19   did plaintiff miss -- why did Mr. Berberich miss the other 12

20   days?  Was he ill?  Was he taking care of family members?  Was

21   he gambling at a casino?  I mean, what was --

22             MR. THOMPSON:  He was not gambling at a casino.  It

23   was for FMLA-related reasons.  Again --

24             THE COURT:  FMLA reasons?

25             MR. THOMPSON:  Yes.  That's not an issue we intend to

1    raise.

2              THE COURT:  Okay.

3              MR. THOMPSON:  We would like to avoid the --

4              THE COURT:  So it seems to me that the issue here is

5    that Mr. Berberich missed 14 days from the 90-day time period.

6    He claims that some of those days were to assist in the

7    investigation.  And KCS agrees that two of those days were, and

8    should not be held against him.

9              KCS claims that even not holding those two against

10   him, he exceeded a standard of missed days that required or

11   called for some sanction, but plaintiff says that even though

12   KCS says you're not holding those days against him, they really

13   did, and sanctioned him for what they allege were just the 12

14   days.  Is that, essentially, what our case is -- or dispute is?

15             MR. THOMPSON:  That is, Your Honor.

16             MR. DALGLEISH:  If that's their challenge, then yes.

17             THE COURT:  Okay.  All right.  Well, that's helpful

18   because as I said, I thought there was a little bit of confusion

19   about that, both in my mind and I thought maybe counsel's mind.

20   So I think that is helpful.

21             So given that, I don't think we need to or should get

22   into a discussion as to the reason for the other 12 days being

23   missed.  And I understand plaintiff's concern that the jury may

24   think, well, what was he doing, but since the dispute's about,

25   were they really counting the days he was assisting in the

1    investigation against him, I -- I think people understand that

2    people miss days of work.

3            They're ill.  Their grandmother's ill.  We're

4    celebrating yet another Chief's Super Bowl victory.  Whatever

5    the reasons may be.  People understand that people miss work.

6    So I don't think we need to get into what his reasons for that

7    were.

8            With that said, let's walk through our motions in

9    limine.  And the first one addresses what we were just talking

10   about, which is why I jumped back to it.  That plaintiff should

11   be precluded from presenting testimony concerning reasons for

12   absence, other than his claim that he laid off work to assist in

13   the administrative hearing.

14           As I understand it, you're not disputing that,

15   plaintiff; is that correct?

16           MR. THOMPSON:  That's correct, Your Honor.

17           THE COURT:  All right.  That's going to be agreed to.

18           Defendant's next motion in limine is any allegations

19   that his absences should have been covered by FMLA.  And we're

20   not going to raise that either.  We're in agreement of that,

21   correct?

22           MR. THOMPSON:  We are.

23           THE COURT:  All right.  So that one is agreed to as

24   well.

25           The third motion in limine is, concerning any actual

```
 1   monetary damages associated with this absentee claim.  I

 2   understand plaintiffs aren't asserting a monetary damage for

 3   this; is that correct?

 4             MR. THOMPSON:  That's correct, Judge.

 5             THE COURT:  Okay.  So that one is also agreed.

 6             Fourth, should be precluded from introducing evidence

 7   of any purported emotional distress damages related to his

 8   absenteeism plan.  Defendant, talk to me about this motion.

 9             MR. DALGLEISH:  Okay.  We understand and respect they

10   have pled that.  So the issue is not that they haven't put it in

11   play.  Our challenge on this motion in limine is, our view,

12   under the applicable law, they don't have the requisite evidence

13   to establish emotional distress.  So it should be included -- it

14   should be excluded.  Pretrial order contains zero factual or

15   other -- other specificity about what would be the basis for an

16   emotional claim.

17             THE COURT:  But it does raise the claim.

18             MR. DALGLEISH:  It does.

19             THE COURT:  Defendants, here's -- here's my view on

20   that.  I thought that was your position.  You can make a claim

21   that at trial, there will not be any evidence of emotional

22   distress so the Court should grant summary judgment on that

23   claim.

24             MR. DALGLEISH:  True.

25             THE COURT:  But you didn't make that claim.
```

```
 1              MR. DALGLEISH:  True.

 2              THE COURT:  In summary judgment you made other claims,

 3     and you were successful in some, but you didn't make that claim.

 4     And having not made that claim by the deadline to file motion of

 5     summary judgment, you're out of time to make that claim.

 6              So now the claim is going to be that plaintiff did not

 7     produce, past tense verb, any evidence of emotional distress,

 8     but that's not a claim you can make before the trial started,

 9     that's a trial you make at the end -- I mean a claim you make at

10     the end.  So that's how I look at this procedurally.  Do you

11     differ with that?

12              MR. DALGLEISH:  No, Your Honor.  I think it's

13     really -- don't disagree.  It's a quantum of evidence, I think.

14     And we don't think he's there based upon what's limited in the

15     pretrial order, but in fairness and understand, he's pled it.

16              THE COURT:  All right.  I'm going to overrule that

17     objection then.

18              Motion in Limine Number 5, precluded of entering any

19     evidence to support a claim for punitive damages.  I'm going to

20     take this in two parts, although there's another piece to it.

21     So what do we have to add to plaintiff's punitive claim that's

22     different from what we've just discussed about the emotional

23     distress?

24              MR. DALGLEISH:  Nothing, Your Honor.

25              THE COURT:  All right.  So I'm going to allow them
```

1    to --

2        MR. DALGLEISH:  Other than I think it's a

3    heightened -- it's a very important issue on punitives.  Even to

4    the fact of instructing the jury, you know, at the beginning of

5    the case.  We've got a concern about that because we don't think

6    it's -- we don't think it rises to the level of a punitive case.

7        THE COURT:  Right, but, again, having not addressed

8    that under Rule 56 standards, that's a strategic decision you

9    made.  So here we are.  So I'm going to allow the plaintiffs to

10   pursue, as at the start of the trial, their punitive claim.

11       Let's talk about the second part of this, which is

12   introducing evidence of net worth or ability to pay.  I

13   understand that's an element often in a punitive claim.

14   Obviously, in a case like this where the defendant is not Ma and

15   Pa Inc., but a large corporation, that sort of evidence can

16   become disproportionate to claims.

17       Plaintiff, tell me -- and I understand this is often a

18   part of a punitive claim, but tell me how you want to approach

19   the monetary value of defendants with respect to your punitive

20   claim.

21       MR. THOMPSON:  Sure.  So during our closing, we do

22   intend to introduce their profit to support a punitive damage

23   claim or really, the amount.  That being said --

24       THE COURT:  How much punitive damages are you seeking?

25   Do you have an amount you're going to ask the jury for?

22-02426      Berberich v KCS_Pretrial      06.26.24        30

```
 1              MR. THOMPSON:  No.  We're not going to ask for an
 2      amount.  We're just going to say, do what you think is
 3      reasonable.  However, they are capped by statute at 250,000, and
 4      presumptively, reasonable under that amount.
 5              THE COURT:  Right, but I -- my sense is, we don't tell
 6      that to the jury.  Isn't that the law?
 7              MR. THOMPSON:  We do not.  That's right.
 8              THE COURT:  Right.  So how much profit did KCS make?
 9              MR. THOMPSON:  I don't know that offhand, Your Honor.
10              THE COURT:  Well, you said you're going to introduce
11      evidence of that.
12              MR. THOMPSON:  Yeah.  We'll pull up their -- the
13      state -- their filing -- their annual filing with their profit.
14              THE COURT:  You haven't looked at that yet?
15              MR. THOMPSON:  We have, I just don't know the number
16      offhand, Judge.
17              THE COURT:  Roughly, what are we talking about?
18              MR. THOMPSON:  Oh, it's hundreds of millions of
19      dollars.
20              THE COURT:  So -- I mean, I understand that you're
21      entitled, abstractly, to do this, but the disproportionality of
22      any amount you ask, without regard to a statutory count, and the
23      amount of profit involved, seems to me so out of whack, that's a
24      Latin term, to leave me a bit uncomfortable as to how to
25      proceed.  So talk to me a bit more about how you -- what you
```

```
 1    think you should do.

 2              MR. THOMPSON:  Yeah.  So I think that that

 3    comfortability should be resolved by the statutory cap, whatever

 4    the jury awards.  If they award something that is

 5    disproportionate to what this case warrants, it's going to be

 6    reduced at 250,000.  That's presumptively reasonable because of

 7    the cap.

 8              THE COURT:  Well, that's true, but it's not true

 9    because there's a concern that jurors may think, well, this is

10    Daddy Warbucks.  He's, like, Scrooge McDuck swimming in a

11    vault of cash, what difference is it going to make to them?

12    Even though their award may be capped, it may influence them in

13    making an award just because defendant is so, in the jury's

14    mind, obscenely flush with cash.

15              So that's the concern that comes up in these types of

16    cases.  And I'm frankly not sure how to address it, but that's

17    why I want to discuss this.

18              MR. THOMPSON:  I understand the Court's concern.  That

19    is one of the factors to be considered.  If the defendant is

20    insanely rich, then a greater punitive damage award is

21    warranted.  Because the whole idea of punitive damages is, you

22    need to get this company's attention to stop doing this.  That

23    is a purpose of punitive damages.  So the fact that they are

24    insanely rich is something the jury should consider.

25              THE COURT:  That's why it's usually one of the factors
```

 1   to consider.

 2          Defendant, what do you -- how do you suggest we

 3   approach this?

 4          MR. DALGLEISH:  I think there's a more --

 5   respectfully, a more dispositive way to address this.  In that

 6   the plaintiff -- it's improper for counsel to get up and start

 7   arguing about -- or putting forth evidence about net worth.

 8          There's nothing on the exhibit list.  There's nothing

 9   in the pretrial order.  There's no document.  There's no

10   testimony.  There's no nothing about punitive damages.  So we

11   object that it's out.  There is no such evidence.

12          THE COURT:  So what you're saying is, the issue's

13   resolved to the fact that plaintiffs have not identified an

14   exhibit to address these issues?

15          MR. DALGLEISH:  Yes.  And it's an extremely complex

16   issue to talk about the net worth of an interconnected, very

17   complex entity.  There's no evidence in this record about that.

18   And it's -- it's not evidence for counsel to come forth, what he

19   or she thinks the company is worth.  There has to be evidence of

20   that.  And there's none in this record.

21          THE COURT:  Plaintiff, that seems to be a procedural

22   problem to me.  How do you intend to address this issue?

23          MR. THOMPSON:  Sure.  The Court can take judicial

24   notice of --

25          THE COURT:  I'm not going to take judicial notice of

1    the net worth of somebody.

2           MR. THOMPSON:  Of public filings, which include the

3    company's filings.  And I can certainly cross-examine their

4    witnesses on that.

5           THE COURT:  Are their witnesses competent to testify

6    as to the net worth or the profit of the company?

7           MR. THOMPSON:  If I show them the filings they've made

8    with --

9           THE COURT:  Well --

10          MR. THOMPSON:  -- the federal government.

11          THE COURT:  So the witness either themselves is

12   confident to produce information or they're not.  You can't

13   educate a witness on the stand as to a fact with which they're

14   not previously aware, and then solicit testimony from that

15   saying, I've layed a foundation because I just told them what

16   the foundation is.  That's not -- that's not a proper use of

17   foundation or evidentiary exhibits.

18          MR. THOMPSON:  If the Court's wish is -- we are happy

19   to amend our exhibit list in include their corporate filing.

20          THE COURT:  I think you're probably out of time to do

21   that.

22          MR. THOMPSON:  Otherwise, it's a public filing.  This

23   is a fact.  This is not anything in dispute.  Their profit is

24   filed every year.

25          THE COURT:  That's irrelevant.  You haven't identified

1    that exhibit.

2          MR. THOMPSON:  Sure.  But a publicly filed document is

3    something the Court can and should take judicial notice of.  And

4    I can question a witness on something that is public record.

5          THE COURT:  So I'm not going to take judicial notice

6    of public filings.  Because they're not the sort of thing

7    that -- obviously, the FCC, from time to time, regularly, takes

8    issue with the accuracy of public filings.  I'm not going to put

9    the Court's stamp of imprimatur on that just because they

10   publicly filed it.

11         You can examine -- you can inquire of the witnesses

12   about these matters, but unless you're able to lay a foundation

13   that they have independent knowledge, that is to say, you can't

14   educate them of that, and I strongly suspect they're not going

15   to have knowledge of the issues, then they're going to lack the

16   foundation to give an answer.

17         So I don't -- I think that's kind of resolves my

18   concern here.  There's no evidence that's been identified as

19   to -- or witness that's been identified that's competent to

20   testify or produce as to the -- either the profit or the net

21   worth of defendant.

22         I think you can make arguments that this is a large

23   company.  They have money.  Of punitive damage.  We got their

24   attention.  I don't think that the case has been structured, at

25   this point, where any specific evidence of what those dollar

1    amounts is are likely to be admitted.

2              MR. THOMPSON:  There is a -- another witness who

3    certainly knows.  The union rep certainly knows their profit

4    statements.  They're sent that every year.  It's part of their

5    bargaining.  He'll know it.

6              THE COURT:  The union rep that you have testifying?

7              MR. THOMPSON:  Yeah.

8              MR. DALGLEISH:  Strongly disagree, Your Honor.

9              THE COURT:  Tell me what you disagree.  Disagree that

10   he knows or --

11             MR. DALGLEISH:  I don't know.  But the union rep is

12   not qualified to render testimony on the net worth of a company.

13   And he hasn't been identified as such.  And it's not anywhere in

14   the pretrial order to do that.  So we object to any such effort.

15   Our witness is --

16             THE COURT:  I don't think at this point there's any

17   avenue that's been preserved to put dollar amounts of KCS's net

18   worth or profit into evidence for the company.  I think you can

19   talk generally about -- they're a large company, you know, they

20   have money.  Because we all know -- the jury won't, but we all

21   know that we're talking about a quarter million, at the most.

22             I don't think there's any reason that you need to go

23   into specific dollar amounts beyond that.  And I think to the

24   extent that you did, that really gives me concern that those

25   numbers are likely to inflame the passions of the jury, that,

1    well, there's a lot of money here.  Let's just spread it around

2    without regard to what the claims are.

3          So given where we're at on the posture of this, I

4    don't think we're going to get into that.  I'm obviously

5    allowing you to argue for punitives and to make the arguments

6    we've just discussed, but I don't think there's any evidence

7    that we've situated ourselves to put in, regarding the worth of

8    that.

9          MR. THOMPSON:  Judge, just so I'm clear because I

10   don't want to run afoul of the Court.  Am I allowed to ask the

11   union rep if he received, as part of his union rep duties,

12   statements from KCS about their profit?

13         THE COURT:  Well, you are, but if he testified about

14   that, lacking independent knowledge of that, that would be

15   hearsay.  If the union rep testified about a document he's

16   read --

17         MR. THOMPSON:  From KCS.

18         THE COURT:  -- of which he has no independent

19   knowledge --

20         MR. THOMPSON:  But if he's testifying it's from KCS,

21   that's admission of a party opponent.  He's already testified to

22   what he's been told in considering union bargaining.

23         Now, I don't know if he'll tell you, yeah, I know the

24   number, but I know they send out these things quarterly to the

25   union reps exactly so they can negotiate.  I think I should be

1    allowed to question and ask him, did you receive this.  Do you

2    know what it says.  Do you know the -- he may not.  If he does,

3    then I think it's fair game.

4              MR. DALGLEISH:  Not on the exhibit list.  Not

5    identified for that purpose.  Not on the pretrial order.

6              THE COURT:  Well, he's not -- he's not asking to

7    introduce the -- my concern here is, to be frank, that being a

8    good lawyer, whether the union rep is familiar with it now or

9    not, he's likely to be familiar with it by Monday.

10             And I'm not really sure, the way this case has been

11   situated or witnesses and exhibits have been identified, that

12   that's an appropriate use of testimony at this point.

13             MR. THOMPSON:  Judge, so I will not -- I mean, I will

14   not educate him.  If he truly knows independently as part of his

15   job duties, then I think it's fair game.  It's not going to be

16   at the case of me educating him.

17             THE COURT:  You'll have to raise that with me before

18   trial.  I don't think there's any probative value in actually

19   getting into, last year, KCS made $100 million in profit.  When

20   we all know we're talking about 250,000 bucks.

21             I think you can identify and argue they're a large,

22   successful company, but I just think we're too far down the road

23   on dollar amounts for them to come up.

24             MR. THOMPSON:  Understood, Judge.

25             THE COURT:  So I'm going to overrule the first part of

1   Motion in Limine Number 5, but sustain the second part.

2           Number 6, plaintiff should be precluded from offering

3   evidence of an alleged history of retaliating against employees.

4   I think if it means other employees, my sense is, you don't

5   intend to do that.

6           MR. THOMPSON:  I don't intend to belabor it with any

7   specific examples.  I think the union rep can talk about it.

8   Certainly, my client can talk about it.  When he's going to be

9   talking about -- so we need to prove protected activity, right?

10  So my client's going to talk about the reason that he filed a

11  complaint with OSHA.  Why he went to the hearing with Department

12  of Labor.  He needs to prove he did that in good faith.

13          Part of that's going to be him saying, look, Kansas

14  City Southern does this a lot and you have to draw the line in

15  the sand at some point.  That's his reason for doing this.

16          THE COURT:  Well, certainly Mr. Berberich can testify

17  that he felt like he was being retaliated against.  And he felt

18  like it was important for him to pursue his claims, and that's

19  why he filed his administrative claims.  And he's certainly

20  entitled, as far as I'm concerned, to tell his story.

21          But what we're not going to do is try other stories.

22  Because to the extent that he said, Kansas City Southern has a

23  history of doing it through retaliating against other employees.

24  The next question is, well, who?

25          And he may say, well, Bob and Florence and Jerry, and

```
 1   then Kansas City Southern will say, well, we didn't retaliate

 2   against them.  And then suddenly we're trying four claims and

 3   not one.  And we're not going to do that.

 4            MR. THOMPSON:  I don't plan to introduce any specific

 5   examples.

 6            THE COURT:  Well, you can't -- you can't -- you can't

 7   say they've done this before without explaining when they've

 8   done it before.

 9            MR. THOMPSON:  I don't know how then they expect us to

10   show protected activity.  Because we've got to show that our --

11            THE COURT:  His protected activity is that the law

12   protects him, under your theory, from being retaliated against

13   by disclosing or pursuing claims of malfeasance against the

14   defendant.  And whether this is the first time or the thousandth

15   time that KCS has done that, isn't particularly relevant to the

16   fact that he is protected by the law from being retaliated

17   against for cooperating in an investigation.

18            MR. THOMPSON:  Sure.  But they dispute that he's

19   protected by the law.

20            THE COURT:  They what?

21            MR. THOMPSON:  They dispute that he's protected by the

22   law for going to that hearing.  They don't agree that that is

23   protected activity.

24            THE COURT:  I don't think that's right.  They don't

25   dispute that.
```

1           MR. THOMASON:  Okay.

2           THE COURT:  They dispute that that's what he did, but

3    they don't dispute that if he did that, he's protected by the

4    law.

5           MR. THOMPSON:  So are we all in agreement that the

6    days that he was at the -- or took off for the Department of

7    Labor hearing, is protected activity?

8           THE COURT:  So defendant said that earlier in this

9    hearing.

10          MR. DALGLEISH:  We took off the days that he was

11   charged with that you identified in your letter.

12          MR. THOMPSON:  I just want to make sure for element

13   purposes --

14          MR. DALGLEISH:  Well, we don't agree it's necessarily

15   protected activity, but we --

16          THE COURT:  You don't agree that what's protected

17   activity?

18          MR. DALGLEISH:  That what he did rises to the level of

19   protected activity.

20          THE COURT:  During those two days?

21          MR. DALGLEISH:  Pardon me?

22          THE COURT:  During the two days?

23          MR. DALGLEISH:  Well, we took the two days off so it

24   doesn't matter.

25          THE COURT:  So what do you not agree with?

1          MR. DALGLEISH:  Well, I don't agree with getting in --

2     trying other cases.

3          THE COURT:  Well, I agree on that.  You said we don't

4     agree that what he did is protected activity.  That's the

5     statement that confused me.

6          MR. DALGLEISH:  Well, he's got -- he's got 12 days.

7     He's got 12 days that he missed --

8          THE COURT:  Well, you're just saying those 12 days

9     weren't protected activity.

10         MR. DALGLEISH:  Yeah.  I mean, he's over the limit --

11    he's over the company's limit however you look at it.  In our

12    world view --

13         THE COURT:  But you're agreeing that to the extent he

14    was pursuing claims, his absenteeism for pursuing claims is

15    protected activity.

16         MR. DALGLEISH:  Well, we're saying it's moot because

17    we didn't charge him with that.  That that's not --

18         THE COURT:  So I have a simple question.  You're

19    agreeing that days he took off to pursue claims against the

20    company was protected activity?

21         MR. DALGLEISH:  No, we're not stipulating to that.  I

22    don't think it -- I don't think it satisfies the standard, but

23    our view is that it's moot because he wasn't charged for that.

24         THE COURT:  So why are you not stipulating to that?  I

25    mean, you're telling me we're not counting the days, but we're

```
 1    not agreeing to count those two days.  We can't have a foot on

 2    the boat and a foot on the dock.  We need to get you one place

 3    or another.  Where would you like to be?

 4              MR. DALGLEISH:  I think I'm comfortable where we are.

 5              THE COURT:  Well, you may be comfortable, but I'm not.

 6              MR. DALGLEISH:  Maybe I'm not articulating it.  We're

 7    not willing to stipulate that anything that he did is protected

 8    activity.

 9              THE COURT:  Why?

10              MR. DALGLEISH:  Because that's his burden to prove.

11    That's one of his elements of burden of proof.  We don't think

12    it matters one way or the other in this case because he wasn't

13    charged for the days that his lawyer said --

14              THE COURT:  Okay.  Let me dissect this.  So it's

15    plaintiff's burden of proof to show that he took days off,

16    whatever the number may be, to pursue or assist in the

17    investigation of claims against the company.

18              And you're not going to stipulate that that's what he

19    did because they have to prove that that's why he took whatever

20    days off that he did, correct?

21              MR. DALGLEISH:  Yes.  Yes.  And --

22              THE COURT:  If he proves that, you're agreeing though

23    that at that point, that was protected activity?

24              MR. DALGLEISH:  No.  We're not --

25              THE COURT:  Why?
```

```
 1              MR. DALGLEISH:  Because we don't believe that
 2    consulting with your lawyer or necessarily testifying is per se
 3    protected activity.  It might be.  The jury could conclude that.
 4              THE COURT:  Well, the jury's not going to make the
 5    issue of law.
 6              MR. DALGLEISH:  Well, true, but we're not willing to
 7    stipulate away from -- that's one of his burdens of proof.
 8    That's one of his first elements of his -- of this cause of
 9    action.  And we don't think he can meet it.
10              THE COURT:  I'm -- I'm very confused.
11              MR. DALGLEISH:  What am I not saying?
12              We kind of set this out in the trial brief,
13    Your Honor, but --
14              THE COURT:  I was confused there too.
15              MR. DALGLEISH:  Yeah.  We're a little puzzled
16    ourselves as to what -- what plaintiff's theory is.  I guess
17    they're denying that we gave them the two day's credit.  I --
18    I -- maybe that's what I'm hearing.
19              THE COURT:  I think what plaintiff's are saying -- and
20    please correct me if I'm wrong, but as I started this, I've
21    got -- I think there's been some confusion about what this
22    trial's about.
23              I think plaintiffs are saying -- even though you're
24    saying, overtly, we didn't count these days against you, you
25    really did subliminally because you sanctioned us, if that's the
```

1  right word, for days that we did miss.  And you wouldn't have

2  done that, but for these other days.  Even though you're saying

3  you didn't consider them.

4          MR. DALGLEISH:  That's what I hear them saying today,

5  that they don't -- that they want to make a question of fact as

6  to whether we really took off the two days.  That's fine.  Game

7  on on that.

8          THE COURT:  But -- but you're not even agreeing that

9  the days they took off to investigate -- even though apparently

10 you agreed at the time -- you, KCS.  At the time said, we're not

11 counting these days against you because they were protected

12 activity, but now you're backing away from that.

13         MR. DALGLEISH:  No, we're not -- we're not backing

14 away from anything, Judge.

15         THE COURT:  Didn't you at the time, you, KCS, say,

16 we're not counting these days against you because we'll exceed

17 those as protected activity?

18         MR. DALGLEISH:  No.  The person who made that decision

19 probably doesn't even -- doesn't fall -- he's -- he does the

20 administrative handling of the trainment, okay?

21         What he saw is that the plaintiff came forth with a

22 letter from his lawyer, said, hey, have to be off these days.

23 He gave him credit for that.  He didn't count those against him.

24 It was no more legally sophisticated than that.  So there's no

25 backing away or changing of course, that's just factually what

45

```
1    occurred.
2           THE COURT:  Well, I thought there was an agreement
3    that plaintiff would not be sanctioned for days he took that
4    were protected activity, but apparently there's not.
5           MR. DALGLEISH:  Well, there's an agreement -- there
6    was a factual agreement that he is not sanctioned for the days
7    that his lawyer said he was doing -- consulting and doing the
8    hearing, okay?  There was -- it was not more sophisticated than
9    that.
10          THE COURT:  So it seems to me that that boat is
11   getting further from the dock and you're being stretched out
12   like a gymnast.  But so far, you've still got one foot on the
13   boat and one foot on the dock.
14          Are you admitting that some of his days off were
15   protected activity or can -- can plaintiff's pursue a claim that
16   said they did not agree to give us any time off for protected
17   activity?  That's -- that's a choice you have to make.
18          MR. DALGLEISH:  Well, I think -- we're not willing to
19   stipulate that anything he did is protected activity.  We think
20   that's part of his burden of proof.
21          THE COURT:  Well, that's where I started --
22          MR. DALGLEISH:  Right.
23          THE COURT:  -- but it didn't go well.  Because I said
24   if they meet the burden that the days they took off to meet with
25   the lawyer were protected activity, are you going to -- once
```

1   they've shown that factually, that it wasn't -- the lawyer said

2   I'm meeting him, but he went to the casino.  He was actually

3   working on the claims.  Once they meet that factual burden, do

4   you agree that those days were protected activity?

5            MR. DALGLEISH:  No, Your Honor, because we don't --

6   but we also say it doesn't matter.  It's moot because we didn't

7   count those days against him.  He wasn't -- he wasn't charged

8   for those days.  He wants to call them protected activity.  We

9   think that's his burden of proof.  We're not willing to

10  stipulate --

11           THE COURT:  What's his burden of proof, the law or the

12  fact?

13           MR. DALGLEISH:  Well, both.  He's got to prove all of

14  his elements of an FRSA claim.  The first one is that what he

15  did is protected activity, okay?  If he can prove that, okay,

16  fine.  But our view, our factual view, is that it doesn't matter

17  with regard to the two days that his lawyer identified that he

18  was in the original 14 because he wasn't charged for those.

19           THE COURT:  And why wasn't he charged for them?

20           MR. DALGLEISH:  The guy took them off.  He gave him

21  the benefit of the doubt.  He came forth -- the plaintiff came

22  forth --

23           THE COURT:  But you're now second-guessing that

24  decision?

25           MR. DALGLEISH:  No.

1            THE COURT:  Well, you are.  Because if that's the

2    position you're going to maintain, I'm going to allow plaintiffs

3    to argue:  Well, initially we were told they weren't going to

4    count these days against us, but now they didn't agree with

5    that.

6            MR. DALGLEISH:  Well, no --

7            THE COURT:  No, that's where we're at, counsel.

8    Either you agree that KCS gave him those days off because they

9    were protected activity or you take the position, we gave him

10   the days off, but we shouldn't have because we don't agree they

11   were protected activity, and then they can argue that they did

12   not give us time off for protected activity.

13           Boat or dock, it's time to pick.

14           MR. DALGLEISH:  Okay.  Well, that's something I want

15   to talk to the client about.  If that's all right.  Because I

16   still think factually it doesn't matter --

17           THE COURT:  Well, I think it does.

18           MR. DALGLEISH:  Okay.

19           THE COURT:  And I have the bigger seat.

20           MR. DALGLEISH:  I respect that.  I'd just like to talk

21   to the client about that.

22           THE COURT:  All right.  Well, at this point,

23   plaintiffs, absent something from defendants, you're entitled to

24   say that although they said they're giving us time off for

25   protected activity, they now deny that we had any protected

```
 1  activity from what we are doing.  And so, game on.  That's,
 2  apparently, to my surprise, where defendant's are at.
 3          Nevertheless, we're just going to talk about their
 4  retaliation against Mr. Berberich.  We're not going to talk
 5  about the retaliation -- we're not going to try any other cases.
 6          MR. THOMPSON:  So my concern, Judge, if they're taking
 7  the position that it is not protected activity, we're going to
 8  take off time to attend a DOL investigation.  If that is their
 9  position, we now need to talk about the underlying incident
10  that --
11          THE COURT:  What is the underlying incident?
12          MR. THOMPSON:  KCS had a rule where they essentially
13  asked the engineer to get out of the train and throw a switch.
14          THE COURT:  I remember this scenario.  And he, in
15  fact, thought it was unsafe.
16          MR. THOMPSON:  That's right.  And so if we need to
17  prove that he -- the Court has found that it was not protected
18  activity in the summary judgment order, right?
19          THE COURT:  Well -- and defendant argues that it
20  wasn't protected activity because the Court held against the
21  claim, but that's a -- that's a specious argument.  Because the
22  rule of protected activity doesn't mean that you only get credit
23  for it if you win.
24          MR. THOMPSON:  Yeah.
25          THE COURT:  The rule is, you get credit for it to
```

1   pursue the claim.  So I've already thought defendant's arguments

2   in that regard are wholly without merit.

3            MR. THOMPSON:  All right.  Good.

4            THE COURT:  I thought they were going to say that to

5   the extent he was investigating a claim, then those were

6   protected days, we're just left with the 12.  Apparently,

7   they're not.  So I guess you've got to -- and he just told you,

8   you've got to prove the protected activity.

9            I guess you've got to raise up the fact that he

10  thought there was a safety violation against defendant, and

11  that's what he pursued.  The fact that he lost, it's irrelevant.

12  I think that's, to my surprise, where we are.

13           MR. THOMPSON:  Part of his story is going to be the

14  history of retaliation.

15           THE COURT:  No, it's not.  Because whether he was

16  retaliated against or not is unrelated to whether they

17  retaliated against other people.

18           MR. THOMPSON:  His belief -- so his subjective belief

19  is what matters --

20           THE COURT:  Is not relevant.  His subjective belief is

21  that, well, they did it here because they did it to other

22  people, is exactly the sort of thing that the law precludes.

23           MR. THOMPSON:  So for protected activity under the

24  law, what matters is there's a good faith requirement.  He has

25  to subjectively believe this is a violation of law.  And --

1          THE COURT:  Well, he subjectively believes that

2    because he thought the issue with throwing the switch was a

3    safety issue that he pursued.  And that they disputed him on.

4    Again, it's, I think irrelevant, that he lost that claim

5    ultimately, but he subjectively believed there was a safety

6    issue, and that's why he pursued it.

7          MR. THOMPSON:  It's actually the discipline for that

8    that is illegal and is at issue at the Department of Labor.  So

9    he gets disciplined.  He then says, this is retaliation.

10         Part of the reason he thinks that's retaliation and

11   files a claim with the Department of Labor that ends up before

12   the hearing is because of their history -- what he believes is

13   their history of retaliation.

14         THE COURT:  Well, we're not trying other cases.  He

15   can say they retaliated against me because I raised a safety

16   issue, which they completely disregarded.  And I filed a claim

17   and they didn't like that I filed a claim, so they retaliated

18   against me.

19         The fact that they may or may not have done that

20   against other people is not relevant.  The fact that ultimately

21   he was not successful in his claim is not relevant.  If he

22   subjectively believed that that was a safety issue and he was

23   entitled to pursue it, that's all he needs.

24         MR. THOMPSON:  We understand the Court's ruling,

25   Your Honor.  Thank you.

1           THE COURT:  Anything else on this issue?  I think you

2    created a problem for yourselves, defendant, but so be it.  So

3    I'm granting Number 6.  We're not going to talk about other

4    cases.

5           Number 7, attorneys' fees.  Isn't that a post-trial

6    matter?

7           MR. THOMPSON:  Yes.

8           THE COURT:  So I'm going to grant defendant's -- I

9    guess it's agreed, that we'll take that up post-trial, but not

10   during the trial.  Excuse me.

11          Eight.  I don't understand this.  Congressional

12   intent.  Is this an issue, plaintiff?

13          MR. THOMPSON:  No.

14          THE COURT:  All right.  Well, that's agreed.

15          Plaintiff's should be precluded from offering any

16   evidence related to the dismissed claims.  Tell me what we're

17   talking about here, defendant.

18          MR. DALGLEISH:  The dismissed claims, Your Honor, are

19   the incidents regarding switching and the incident regarding

20   leaning on the rail car.  The Court has granted summary judgment

21   on those claims.  We don't think they need to be part of this

22   case.  It's irrelevant.

23          The issue is whether he was retaliated against as a

24   result of the discipline charge, which happened a year or two

25   after those two incidents.  That's getting into --

```
 1          THE COURT:  So I granted summary judgment that it was

 2   not inappropriate for KCS to discipline him for those issues.

 3          MR. DALGLEISH:  I'm sorry, sir?  No.  He -- well, you

 4   granted summary judgment that he did not state a claim under the

 5   FRSA for both of those other claims that -- he had three claims

 6   in his lawsuit.

 7          And you granted summary judgment on those other two

 8   claims.  Doing switch claim.  And doing -- leaning on the rail

 9   car claim.  So our view is that he's got one count remaining.

10   That count is this absenteeism issue that we've been discussing.

11   And that's --

12          THE COURT:  But the absenteeism issue, in the last 15

13   minutes, has become a much larger issue because he's claimed

14   that part of his absenteeism was to pursue claims that he had a

15   subjective, good faith belief were violations.  You're denying

16   that.

17          So he's now entitled to show:  I thought there were

18   safety issues.  I pursued them.  I understand that he lost, but

19   that's irrelevant.  If he thought he had a good faith basis that

20   there was a safety issue, he pursued them.  He was retaliated

21   against for pursuing his claims.  That becomes a part of his

22   retaliation story.

23          MR. DALGLEISH:  Well, I -- again, I don't -- I don't

24   think we're quite saying that.  What we're saying is what --

25   what we've been -- our colloquy has been, we're not willing to
```

1    stipulate that he has protected activity.

2           I don't think that means that he can now talk about

3    anything about those other two claims which have been dismissed.

4    He can say I thought it was important to testify at the

5    Department of Labor hearing or something to that nature, but to

6    get into specifics of the other two incidents --

7           THE COURT:  No, I think that is where we are.  Because

8    although you keep saying we're not willing to stipulate to the

9    claims, I've always said, they have to prove factually that he

10   thought he was pursuing protected activity.

11          But I asked you several times, if he meets that

12   factual burden, then do you agree that he was protected in doing

13   that?  And you've said, no, I don't agree.

14          So that opens the door up to all these issues that he

15   thought:  Well, I thought this was a safety issue, I pursued it.

16   Not only did the railroad resist me, but they retaliated against

17   me for pursuing those claims.  And since you're not agreeing

18   that they didn't, then he has to talk about all of that.

19          MR. DALGLEISH:  Well, to what degree though,

20   Your Honor?

21          THE COURT:  To whatever degree he needs to show that

22   he pursued what he thought was a safety claim, and that you

23   retaliated against him.

24          MR. DALGLEISH:  Okay.  If that's the -- if there's no

25   limits on what he can talk about, is it equally appropriate that

1  we note that those claims have been dismissed?  The Department

2  of Labor --

3         THE COURT:  No because that's not a legal element.

4  That's not a legal element that he is protected only if he

5  pursues claims of that were successful.  The legal element is

6  that he pursued claims that he had a good faith reason to

7  believe were violations.  Whether he prevailed in those reasons

8  or not is not an element of the legal protection.

9         MR. DALGLEISH:  Well, but his good faith leap is an

10  element.  And among other things, the Department of Labor found

11  him to be untruthful.

12         THE COURT:  That's irrelevant.  The fact -- not --

13  what you're saying is, nobody has a good faith belief to make a

14  claim if ultimately they lose.  That's objectively not the law.

15         MR. DALGLEISH:  Well, I do think if he is allowed to

16  go into these other incidents, then we'd be allowed to -- and

17  then we've got a trial inside of a trial again.  But we would --

18         THE COURT:  Well, you think that, but I'm holding

19  otherwise.  Because the law is, if plaintiff -- you can -- you

20  can pursue whether plaintiff had a good faith belief that this

21  was a violation.  That's what the law requires.

22         The law does not require that he be successful.  So

23  it's irrelevant.  And I will not allow it in trial, the fact

24  that he lost those claims.  But the fact that he was pursuing

25  those claims, and you won't stipulate if, in fact, he shows that

1  he had a good faith basis that -- that he was pursuing

2  violations.

3          If you won't stipulate even upon that proof that he

4  was engaged in protected activity, then he's got to show all of

5  that.  Which means he's got to talk about what happened.  And

6  he's got to talk about why he thought it was a violation of

7  safety.  And why he pursued that.  And how you retaliated in his

8  theory against him.

9          I'm going to allow him to do that because you're not

10 agreeing that anything he did was protected activity.  I'm not

11 going to allow you to put in that he lost his claims because

12 that's not a legal element.

13         That's why I said 20 minutes ago, I think you've

14 created for a problem for yourself here in this hearing.  That's

15 where we're at now.

16         MR. DALGLEISH:  Okay.  Well, that is -- we'll consider

17 that.  I appreciate it.

18         THE COURT:  So I guess at this point I'm denying

19 Defendant's Motion in Limine Number 9.  I guess, subject to

20 further developments, if any.

21         And that appears to conclude the review of the motions

22 in limine.  Is there anything else regarding motions in limine

23 before we get to witness and exhibit objections we need to take

24 up?

25         MR. DALGLEISH:  None from KCS, Your Honor.

```
 1              THE COURT:  All right.  Let's look at witness and
 2    exhibits.  Defendant, you object to Darren Cooper.  And as I --
 3    as I read your objection -- I sense that you were objecting to
 4    broader testimony than you thought -- or than I thought
 5    plaintiffs was really calling him for.
 6              So actually let me start with plaintiffs.  Tell me
 7    what you think Mr. Cooper is going to testify to.
 8              MR. THOMPSON:  So, Judge, there's really, I guess, two
 9    different areas, and part of it depends on what defendant
10    decides.  The first area --
11              THE COURT:  Part of it depends on what?
12              MR. THOMPSON:  Defendant decides as to protected
13    activity.
14              THE COURT:  Okay.
15              MR. THOMPSON:  So the first bucket is -- I'll talk
16    about that in a second.  The first bucket is almost kind of a
17    scene-setter in explaining how Kansas City Southern's discipline
18    process works.  For attendance, he is the --
19              THE COURT:  Objectively.
20              MR. THOMPSON:  Yeah.
21              THE COURT:  Without regard to what they've done to
22    other employees.
23              MR. THOMPSON:  Right.  His just -- what his job as a
24    union rep -- to go to these hearings, and that really they are
25    pro forma.  Everyone's found guilty.  It eventually goes to an
```

1  arbitrator who decides.  Everyone's found guilty, you know,

2  after being charged.

3          So he's going to talk about that process.  That's

4  really going to be his testimony in bucket one.  It's just about

5  the hearing process, his role -- his role as a union rep in it,

6  how that process works.  So that's bucket one.

7          Bucket two, if their position is that Mr. Berberich

8  must prove that he, not just took days off to attend the

9  hearing, but also that he was attending the hearing because he

10  believed that he was unlawful retaliation, then we're also going

11  to have the union rep talk about the underlying activities.

12          Is it, in fact, dangerous for an engineer to get out

13  of the engine and throw a switch?

14          THE COURT:  What's going to be his basis to your

15  testimony as to that issue?

16          MR. THOMPSON:  He's also an employee of KCS.  He's

17  done this.  We'll lay foundation.  We agree, if he doesn't have

18  foundation for something, it's something he won't testify to.

19  If it's something he's personally done and is aware of, both --

20          THE COURT:  What is his job with the railroad outside

21  of being a union rep?

22          MR. THOMPSON:  I believe he's still a working engineer

23  or conductor.

24          THE COURT:  Okay.

25          MR. THOMPSON:  So those are the two buckets of his

```
 1   testimony.  If defendant agrees that -- if Mr. Berberich shows
 2   that he took time off to attend the hearing, and they agree
 3   attending the hearing -- or taking time off to attend the
 4   hearing is protected activity, then we won't get into that
 5   second bucket of the underlying protected activity of refusing
 6   to get out -- to let the engineer get out to throw the switch
 7   and all that stuff.
 8             THE COURT:  Okay.  Defendant.
 9             MS. HARRISON:  Your Honor, as to the first bucket of
10   activity, explaining how the disciplinary process works, it
11   sounds okay in theory, but the comment that plaintiff's counsel
12   made that he plans to testify that everybody is found guilty
13   after being charged, seems to bring in exactly what this Court
14   granted on a motion in limine as to talking about a history of
15   retaliation in broad terms as to other individuals outside
16   Berberich.
17             THE COURT:  What is the evidence going to show that
18   happens at that first charge?  How many of them are resolved
19   there, and do not proceed arbitration?
20             MS. HARRISON:  It's -- it's not the case that every
21   single one is -- goes from a notice to a charge.  There is, you
22   know, a full process and analysis at the hearing.  And so we
23   have a witness that will testify as to how that process works,
24   but it's not the case that every single one proceeds to a
25   punishment and a violation.  It is a case-by-case basis.
```

```
1              THE COURT:  And I understand it's a case-by-case
2    basis, but -- so here's my analogy.  I used to be a prosecutor
3    for a brief period of my life.  And when you talk to
4    prosecutors, you say, what's your conviction rate.  And they'll
5    tell you, if you ask a Russian prosecutor what's his conviction
6    rate, he doesn't understand the question.
7              So the issue is, is this a Russian prosecution kind of
8    a case?  Where everybody's convicted and I don't even know what
9    you're talking about or contrary to what plaintiff's have said,
10   do some of these matters resolve at that first stage of the
11   hearing?
12             MS. HARRISON:  Some of these matters do resolve at the
13   first session.
14             THE COURT:  And your witness will testify to that?
15             MS. HARRISON:  Yes.
16             THE COURT:  So I think through cross-examination and
17   through your own submission of evidence, you can legitimately
18   disagree with their union rep's testimony in that regard.
19             MS. HARRISON:  Understood, Your Honor.
20             On the second bucket of activity -- and I understand
21   that this may resolve differently depending upon conversations
22   with the client.  Where our concern is, plaintiff's counsel just
23   explained that they want Mr. Cooper to testify as to whether
24   this is a safety violation based on his own personal experience,
25   but the Department of Labor hearing wasn't concerning whether or
```

22-02426      Berberich v KCS_Pretrial      06.26.24      60

```
 1   not it was necessarily a safety violation.  It was whether or

 2   not there was retaliation in terminating him previously.

 3            And so it wasn't that --

 4            THE COURT:  It was what?

 5            MS. HARRISON:  It was whether or not he was retaliated

 6   against for reporting those safety violations.  So the DOL

 7   hearing was not about whether there were safety violations.  It

 8   was whether he was retaliated against for reporting those.  And

 9   so it's stacking retaliation claims.  And the safety issue seems

10   too far removed for Mr. Cooper to testify about.

11            THE COURT:  Okay.  Well, first of all, I -- I -- I

12   don't know how I can make this any clearer.  I don't give a hoot

13   what the Department of Labor ultimate hearing decided.

14            The question is, whether Mr. Berberich had a good

15   faith belief that he was pursuing a safety violation.  Even if

16   that belief was ultimately wrong, that's not part of the legal

17   standard.  So the fact that he did not prevail is irrelevant and

18   will absolutely not come in this trial.  And I thought I'd made

19   that clear, but -- is that 127 percent clear?

20            MS. HARRISON:  It is 130 percent clear, Your Honor.

21            THE COURT:  Excellent.  Excellent.

22            MS. HARRISON:  Perhaps I was not clear --

23            THE COURT:  So the question then is, did he think

24   there was a safety violation, first of all.  And did he think

25   KCS retaliated against him by pursuing that safety violation.
```

1          What I understand is, the union steward has the same

2    job or a similar job to what he does.  And so Mr. Berberich, I

3    assume, is going to say, I think this was a safety violation.

4    And I pursued it.  And they wouldn't agree that they weren't

5    retaliating.

6          Mr. Cooper then is going to say, I agree it was a

7    safety violation.  And so when Mr. Berberich said I had a good

8    faith basis to believe that, Mr. Cooper's testimony would be

9    relevant in that regard.

10          Again, you can cross-examine him on that, but I think

11    he's entitled -- if that whole matter is at issue, I think he

12    can testify -- Mr. Cooper can testify about that.

13          MS. HARRISON:  Your Honor -- and I understand.  And

14    just to clarify because I think I was unclear.  It's not the

15    result of the hearing, that's not my position here or

16    defendant's position as to -- to why it is or is not a protected

17    activity.

18          The -- our understanding of a protected activity is

19    that the hearing itself, the investigatory hearing he was laid

20    off to participate in, concerned a safety violation.  And our

21    position is that this hearing did not concern a safety

22    violation.  It concerned whether or not his termination for

23    previously reporting a safety violation was proper.

24          And that the hearing itself --

25          THE COURT:  Well, I understand that, but you need --

1   you need to follow this through.

2              MS. HARRISON:  Yes.

3              THE COURT:  If, in fact, you held against him his

4   participation in pursuing a safety violation, and if he had a

5   good faith basis to believe that there was a safety violation

6   that he was pursuing, then you're holding his pursuing a safety

7   violation against him is retaliation.

8              MS. HARRISON:  I understand the Court's --

9              THE COURT:  I mean, isn't that -- isn't that the law?

10  That if you think there's a good faith basis that a safety

11  violation occurred.  And you pursue that claim as an employee,

12  and the employer sanctions you for that, that's kind of a

13  hornbook case of retaliation, right?

14             MS. HARRISON:  I understand, Your Honor.  Our position

15  is that that is -- that all occurred prior to this hearing.

16  That the hearing was whether they were retaliating against him

17  for a prior report and not --

18             THE COURT:  Which hearing are you talking about now?

19             MS. HARRISON:  -- a safety violation.

20             The hearing that he actually laid off for in 2022, was

21  whether or not he had been retaliated against previously when he

22  was laid off after allegedly reporting safety violations.  The

23  hearing was not about whether or not there was a safety

24  violation.  It was whether or not he had been retaliated

25  against.

```
 1              And so our position is that --

 2              THE COURT:  So those two issues are indubitably

 3   linked.

 4              MS. HARRISON:  I understand Your Honor's position on

 5   that.  I think that this will just be something that is either

 6   resolved after we talk to our client or we understand the

 7   Court's position.

 8              But that is our position on why these safety --

 9   whether or not Mr. Cooper believes it is a safety violation is

10   irrelevant to these claims because the hearing was not about the

11   safety violations, it was about an alleged retaliation.

12              THE COURT:  But retaliation is retaliation for

13   something.  Retaliation doesn't just sort of exist on its own in

14   the ether.  It's retaliation for having done something.  And the

15   something that he did that he claims he was violated against,

16   was, at least in part, pursuing a safety violation.

17              So retaliation is not a standalone item.  It has to be

18   linked to what he did that he was retaliated for under his

19   theory.

20              MS. HARRISON:  Yes.

21              THE COURT:  So if we have to talk about that, then we

22   have to talk about it.

23              MS. HARRISON:  I understand, Your Honor.

24              THE COURT:  So if that's all Mr. Cooper's going to

25   testify about -- and I was really a little unclear in reading
```

1    the filings on this exactly what Mr. Cooper is going to testify

2    about.  But if that's all he's going to testify about, I'm going

3    to allow him to do that.

4        I think his analysis of what happens at these

5    preliminary hearings may be overexuberant.  And defendants are

6    going to cross-examine him on how that's not really what

7    happens.  And they're entitled to do that.  And they're entitled

8    to put on their own evidence.  And if that's, in fact, exactly

9    what happens.

10        If we've got to talk about whether Mr. Berberich had a

11   good faith belief that there was a safety violation involved,

12   then I think Mr. Cooper, who works in that same area, can talk

13   about that as well.  So within the limits of Mr. Cooper's

14   testimony being just those two buckets, as you identified them,

15   I'm going to allow him to do that.

16        Now we've got objections to evidence.  And this is

17   always a frustrating part of these hearings to me because I

18   don't know how many of these objections -- well, first of all, I

19   take it plaintiffs have no objections to defendant's witness

20   list; is that correct?

21        MR. DALGLEISH:  That's correct, Your Honor.

22        THE COURT:  So I've got your objection to defendant's

23   exhibit list, but it doesn't tell me anything.  At least not

24   that I can deal with today.  I mean, you're citing rules of

25   evidence, but I -- I don't know how you think these witness -- I

1    mean these exhibits violate these rules of evidence.

2          So what can we productively address today on your

3    objections to the exhibit list?

4          MR. THOMPSON:  I think we can go through them pretty

5    quickly one-by-one.  Otherwise, we can handle them at the time

6    the trial.  Whichever the Court prefers.

7          THE COURT:  Well, I mean if we could do them

8    prospectively, that would be preferable.

9          MR. THOMPSON:  Okay.

10          THE COURT:  I'm not informed enough from your

11    objection to know what we're talking about.

12          MR. THOMPSON:  I can be succinct, and give the Court

13    enough information to rule.

14          THE COURT:  Great.  All right.

15          MR. THOMPSON:  So Exhibit Number 413, which is the

16    updated discipline guide, this is their discipline policy.

17    Which would be -- there'd be no objection, but as for the date

18    as issue.  It post dates the discipline at issue in this case.

19          So I'm not sure --

20          THE COURT:  Why are we -- why are we using a

21    discipline policy adopted after the factual issues in this case?

22          MS. HARRISON:  It goes to the extent of his emotional

23    distress damages, Your Honor.  The discipline guide will

24    establish that the points have rolling off, and that they had no

25    real impact on his day-to-day activities as of the date they

1   went into effect.

2          To the extent he's claiming emotional distress damages

3   for the time that he had these claims.

4          THE COURT:  Well, that's true after the points were

5   assessed though, correct?  Was this guide issued before or after

6   the two points were assessed?

7          MS. HARRISON:  This guide was issued after, but it

8   deals with how long the points remain on, and the impact of

9   preexisting points.  So they would go to his emotional distress

10  damages.

11         THE COURT:  Why don't we just use the guide that

12  existed at the time the points were assessed?

13         MS. HARRISON:  Because that guide does not go to the

14  impact of the points afterwards.  The updated disciplinary guide

15  will actually establish that these points rolled off last month.

16         THE COURT:  So arguably, at the time the points were

17  assessed, they wouldn't roll off.  It's only points that were

18  assessed after this guide became effective that rolled off.

19         MS. HARRISON:  No.  The -- this is a retroactive

20  guide.

21         THE COURT:  Does it say it's retroactive?

22         MS. HARRISON:  Yes.  It went into effect after the

23  acquisition of the two companies.  To create one set of

24  discipline of how to handle preexisting points that were

25  assessed under KCS after CPKC was formed.

```
 1          THE COURT:  It expressly says that it has retroactive
 2   application?
 3          MS. HARRISON:  I believe so, yes, Your Honor.  It is
 4   retroactive and our witnesses can say it is retroactive.  It's
 5   how -- it governs how they assess those points now.
 6          THE COURT:  All right.  Well, if it has retroactive
 7   application, then it's relevant.  Contingent upon that showing,
 8   I'm going to allow it to be in.
 9          MR. THOMPSON:  Judge, I'm looking at it right now.
10   There is nothing on it that says this is retroactive.  And I'm
11   happy to connect with the Court to show the Court.
12          THE COURT:  Well, my rule is contingent on them
13   showing it's retroactive.  If they can't do it, I'm not going to
14   let it.
15          MR. THOMPSON:  Understood.
16          The next exhibit is 414.  That is Mr. Berberich's
17   discipline history.  Other than the two points, no discipline is
18   at issues in this case.  I don't know what his past disciplinary
19   infractions at work have to do with anything.
20          THE COURT:  Why is 414 relevant?
21          MS. HARRISON:  Well, Your Honor, they're going to --
22   if they're going to claim retaliation and targeting of
23   Mr. Berberich, specifically in retaliation for his prior safety
24   violations, the disciplinary history impeaches that testimony if
25   he feels that he was constantly targeted.  He was not constantly
```

1    targeted.

2            THE COURT:  I don't think he's claiming he was

3    constantly targeted.  I think I asked plaintiffs to identify

4    their claims at the beginning of this hearing, it's -- it's

5    retaliation for him pursuing safety violations.  I don't think

6    he's raising any prior discipline history.

7            MS. HARRISON:  Your Honor, if he -- if he does not do

8    that, then, you know, this may not come into effect.  But we put

9    it on here to impeach him if he does testify that he was

10   constantly -- that he felt he was constantly targeted by KCS.

11   He has previously had testimony related to his dismissed claims

12   that he felt he was being birddogged and watched constantly.

13           THE COURT:  I'm going to strike this exhibit at this

14   time, but if he opens the door to it, you're entitled then,

15   after consultation with the Court, to introduce that in rebuttal

16   to his claims.

17           415.

18           MR. THOMPSON:  415 is the complaint Mr. Berberich

19   filed with OSHA.  I don't think that or any other pleading

20   should be admitted.

21           THE COURT:  Why?  I mean, isn't that -- isn't -- isn't

22   his complaint with OSHA what he's claiming retaliation for?

23           MR. THOMPSON:  Sure.  I just don't think that what a

24   lawyer drafted isn't of any evidentiary value.  What OSHA did,

25   the fact that it was for the Department of Labor --

```
 1              THE COURT:  Well, this isn't their determination, this
 2    is just his complaint, correct?
 3              MR. THOMPSON:  That's correct, Judge.
 4              THE COURT:  And it's his -- it's him filing this
 5    complaint that he's claiming he was retaliated for, right?
 6              MR. THOMPSON:  Yeah.  It's a complaint I filed, Judge.
 7    So you're putting a lawyer-drafted thing in front of the jury,
 8    I'm not sure what -- what benefit that is to the jury.
 9              THE COURT:  Well, I don't know -- what benefit it is,
10    is up to them, I guess, but I think it's relevant to your claims
11    in this case.  I'm going to overrule your objection to that.
12              MR. THOMPSON:  416 is a -- is KCS's charged response.
13    It's their response to the complaint in OSHA.  Our objection's
14    the same.  I'm not sure what a lawyer from KCS's opinion as to
15    why --
16              THE COURT:  So the response to the objection goes more
17    to whether his objections were valid as opposed to whether he
18    had a good faith basis to believe they were valid.  And we've
19    discussed that at extraordinary length this morning.  What --
20    what -- based on that discussion, what relevance does this
21    response have?
22              MS. HARRISON:  Your Honor, based on our discussion, we
23    will withdraw 416 and 417.
24              THE COURT:  All right.  Thank you.
25              418, deposition transcript.  I assume this is only --
```

1    I mean, you're not going to impeach your own witness.  And he's

2    going to testify, so we're not going to put his deposition in.

3    How do you intend to use this deposition?

4            MR. THOMPSON:  I don't.  This isn't my exhibit, that's

5    why I objected to it.

6            THE COURT:  All right.  Of course.

7            So I assume you're going to use the deposition only

8    for impeachment purposes.  And it wouldn't be admitted to go to

9    the jury, but if they want to impeach his testimony with prior

10   deposition testimony, they can do that, right?

11           MR. THOMPSON:  Yeah.

12           THE COURT:  That's kind of a rhetorical question.

13           MR. THOMPSON:  Yeah, that's right.

14           THE COURT:  And, of course, this deposition wouldn't

15   go to the jury in any event even if you used it for impeachment

16   purposes.  So I'm going to allow them to use it for impeachment

17   if that becomes appropriate, but it's not going to be admitted

18   as an exhibit and it's not going to go to the jury.

19           Transcript of the hearing.  Why -- I mean, I've been

20   arguing all along that that's not relevant for you.  Why would

21   you -- I guess the question is, why would they put it in.  We've

22   already talked about that.  Are you withdrawing this exhibit as

23   well?

24           MS. HARRISON:  Your Honor, it would only be

25   impeachment.  We don't anticipate offering it for substantive

```
 1   evidence, only if it is needed to impeach anything that

 2   Mr. Berberich says.

 3             THE COURT:  Did Mr. Berberich testify at this hearing

 4   he's -- in that transcript?

 5             MS. HARRISON:  Yes.

 6             THE COURT:  Okay.  That'll be allowed for impeachment

 7   only.

 8             MR. THOMPSON:  Exhibit 420 is the decision order of

 9   the administrative law judge.  The Court has already said that's

10   out.

11             THE COURT:  I assume you're withdrawing that?

12             MS. HARRISON:  Yes, Your Honor.

13             THE COURT:  Arrest record in Joplin.  Why would we --

14   I assume Mr. Berberich was arrested in Joplin.  Why do I care?

15             MS. HARRISON:  Your Honor, given everything we've

16   talked about today, I think we can withdraw --

17             THE COURT:  All right.

18             MS. HARRISON:  -- 421 to 429.

19             THE COURT:  Oh.  Okay.  421 through 429 are all

20   withdrawn.

21             430, what's your objection to that, plaintiff?

22             MR. THOMPSON:  I don't know what that is.

23             THE COURT:  You haven't -- they haven't produced it to

24   you?

25             MR. THOMPSON:  I haven't seen that or at least I don't
```

1    recognize it by that name.  And there's no Bates number or

2    anything like that to let me know what it is.

3            MS. HARRISON:  Your Honor, we intend to create 430

4    with the witness.  The work history that was used by the witness

5    that counted the initial 14 days.  Has a lot of coding that is

6    maybe difficult for the jury to understand.  And so we

7    anticipate having the witness help create a summary for the jury

8    to better understand which days were actually assessed against

9    him.

10            THE COURT:  Which witness is going to do that?

11            MS. HARRISON:  John Neel.

12            THE COURT:  And remind me what -- who he is.

13            MS. HARRISON:  Mr. Neel is the witness who

14    originally -- he does a -- a poll every week of the prior 90

15    days and counts absences, looks to see if they're substantiated,

16    and figures out which ones are unexcused.

17            THE COURT:  All right.

18            MS. HARRISON:  And then makes the decision whether to

19    promote it to an investigatory hearing.

20            THE COURT:  Well, that sounds relevant.  I guess

21    during the development of it at trial, counsel, if you have some

22    objection contemporaneous to, we'll take it up at the time.  I'm

23    not going to certainly strike that exhibit at this point.

24            More depositions.

25            MS. HARRISON:  Your Honor, we can withdraw 431, and

73

1    then 433 to 435.

2              THE COURT:  431 -- I'm sorry.

3              MS. HARRISON:  431 --

4              THE COURT:  431, 433, and 435?

5              MS. HARRISON:  And 434.  Yeah, I think the remaining

6    ones that plaintiff objected to, we'll withdraw those.

7              THE COURT:  Okay.  What about 36 and 37, are you

8    withdrawing them as well?

9              MS. HARRISON:  I should turn over my paper.  Yes.

10             THE COURT:  All right.  Anything else?  Mr. Thompson?

11             MR. THOMPSON:  No, Judge.

12             THE COURT:  And we have no objections to defendant's

13   exhibits.

14             MR. THOMPSON:  Other way around.

15             THE COURT:  Other than these, we have no objection --

16   you're right.  Defendants have no objections to plaintiff's

17   exhibits --

18             MS. HARRISON:  Correct.

19             THE COURT:  -- is that correct?  All right.

20             Does that bring us up to instructions?  Is there

21   anything else we need to talk about before we go to

22   instructions?

23             MR. THOMPSON:  Not for plaintiff, Your Honor.

24             MR. DALGLEISH:  Nothing, Your Honor.

25             THE COURT:  Why don't we take a break at this point.

1    We've been here not quite an hour and a half, but we may spend a

2    little bit of time on the instructions.  So let's take a break.

3         Why don't we come back in about 15 minutes.  I guess

4    that would be 10:35.  And we'll do our instruction conference at

5    that point.  So we're in recess until then.

6         (Recess.)

7         THE COURT:  All right.  Counsel, I guess Monday

8    evening, I think, I submitted to you my proposed instructions.

9    I noted that it was after that, that I got defendant's

10   objections to instructions.

11        I -- I thought we had -- I was wrong.  I thought we

12   had a local rule that said if a deadline is this day, you've got

13   to submit it by 5:00 or 6:00 p.m.  We don't have a local rule.

14   We may in four months, but we don't have one now.

15        Anyway, so I went through and looked at them.  I'll

16   tell you, to be quite candid, I -- I -- my craft law clerk and

17   I -- I always tell my law clerks, the chief criteria for the job

18   is you have to be smarter than the judge.  Personally, it's not

19   an onerous burden.

20        We worked through to correct some of the instructions.

21   I didn't find the ones submitted particularly helpful.  I

22   thought both of them were a little weighted.  Kind of more on

23   the argumentative side.  So I try to be a bit more, as I think

24   it should be, even keel.  Some of these are my stock

25   instructions.  Obviously, we've got the elements in there.

1              I think what we'll do is walk through the ones that I

2    proposed, first of all.  See if there are any objections to

3    those.  I should tell you that it's not unusual in an

4    instruction conference for me to change instructions.

5              So I consider those just a pro forma exercise.  I know

6    some of my colleagues do, I don't.  This is kind of a working

7    issue.  We'll walk through the ones I've proposed, and then

8    we'll take whatever objections you have.  And they'll be

9    preserved as we address them.  Then we'll take up objections for

10   instructions not given that I've proposed.  And I'll see where

11   we go from there.

12             Let's just kind of slog through them, starting with

13   the Instruction Number 1.  Are there any objections to this

14   instruction?

15             MR. THOMPSON:  None for plaintiff, Your Honor.

16             MS. HARRISON:  None for defendant.

17             THE COURT:  Number 2.

18             MR. THOMPSON:  Plaintiff has an objection, Your Honor.

19             MS. HARRISON:  Defendant does have an objection.

20             THE COURT:  Okay.

21             MS. HARRISON:  Just to a few words.

22             THE COURT:  Yeah.  And I kind of struggle with the

23   contentions of the parties because I admitted at the start of

24   the hearing, I've been not crystal clear on what the parties'

25   positions were.

1          So what -- what -- go ahead.

2          MS. HARRISON:  Yes.  So on that point on the final

3    paragraph, I think that we may just need to draft something and

4    submit it to you after we can confer with our client as to

5    whether or not we will be disputing the protected activity

6    element.

7          THE COURT:  Okay.

8          MS. HARRISON:  Because if so, you know, our position

9    would be that the instruction -- the third paragraph should

10   include that specifically all of the allegations are denied and

11   not just that there were no adverse consequences for missing 12

12   days of work, but I think we can provide that to you separately.

13         THE COURT:  All right.

14         MS. HARRISON:  On the second paragraph, just as a

15   correction, it says, "plaintiff was employed."  Plaintiff is

16   employed.  He's still a current employee.  We just want to make

17   sure that's clear for the jury.

18         THE COURT:  That's on the second paragraph?  Oh, I

19   see.  Yes, very first sentence.

20         MS. HARRISON:  Yes.

21         THE COURT:  All right.  We'll make that change.  John,

22   do you have these -- you're doing it as we go along.  Great.

23   Thank you.

24         Go on.

25         MS. HARRISON:  And then in the second sentence, it

1    says, "and that as a result of the missed work, his employer

2    assessed points."  We believe, given the rest of the

3    instructions that should say, "in retaliation for the missed

4    work," instead of, "as a result given the contributing factor is

5    a necessary element of the claim."

6              THE COURT:  Plaintiff, do you object to that?

7              MR. THOMPSON:  No.  Seems like semantics, Judge.  No

8    objection.

9              THE COURT:  All right.  I think that makes sense.

10   "And in retaliation for the missed work."  Okay.

11             MS. HARRISON:  Those are the only objections.  We'll

12   provide --

13             THE COURT:  At this time?

14             MS. HARRISON:  Yes.

15             THE COURT:  Okay.

16             MS. HARRISON:  An update on the third paragraph.  I

17   will note, if there are no changes to the third, it says, "prime

18   facie" -- I have that same issue with my auto correct -- instead

19   of "prima facie."

20             THE COURT:  I didn't even notice that.  Thank you.

21             Anything else for objection two -- I mean, for

22   Instruction 2?

23             MR. THOMPSON:  Plaintiff does, Your Honor.

24             So paragraph 3, there is a sentence that begins with,

25   "even if the jury finds that plaintiff," and continues on.  It

1    ends with, "that it had a legitimate, nondiscriminatory reason

2    for assessing the attendance points against plaintiff."  That is

3    not the law.  They need to do something more.  They need to show

4    they would have assessed the same points against him even absent

5    him missing work to attend the hearing.

6         We would replace "had a legitimate," comma,

7    "nondiscriminatory reason for assessing the attendance points

8    against plaintiff," with, "would have assessed the same points

9    against him even absent him missing work to attend the hearing."

10        THE COURT:  Defendants.

11        MS. HARRISON:  No objection to that change.

12        THE COURT:  I think that's correct.  Where it says,

13   "the same points against him" --

14        MR. THOMPSON:  Even absent him missing work to attend

15   the hearing.

16        THE COURT:  Even -- I'm not going to say absent

17   because that confuses absence.  Even without him --

18        MR. THOMPSON:  Even had he not missed work to attend

19   the hearing.

20        THE COURT:  Even had he not missed work.  All right.

21   Let me see if I got this.  So tell me where we're putting this

22   in.  How the sentence reads.

23        MR. THOMPSON:  This is --

24        THE COURT:  The third sentence.

25        MR. THOMPSON:  The sentences that begins with, "even

1    if the jury finds," starting at, "had a legitimate," comma,

2    "nondiscriminatory reason for assessing the attendance points

3    against plaintiff."

4              THE COURT:  All right.

5              MR. THOMPSON:  Is replaced with, "would have assessed

6    the same points against him even had he not missed work to

7    attend the hearing."

8              THE COURT:  First of all, it should be, "defendant

9    claims as an affirmative defense" and not "that an affirmative

10   defense."  That's a grammatical -- "as an affirmative defense

11   that it would have assessed the same points against him even had

12   he not missed work for attending the hearing," correct?

13             MR. THOMPSON:  Correct.

14             THE COURT:  Up to the comma, and then we would keep,

15   "such that a plaintiff is not entitled to any recovery,"

16   correct?

17             MR. THOMPSON:  Correct.

18             THE COURT:  Are you with us, John?

19             THE COURTROOM DEPUTY:  Yes, sir.

20             THE COURT:  All right.  Great.

21             Any other objections to contentions, Instruction

22   Number 2?

23             MR. THOMPSON:  None for plaintiff.

24             MS. HARRISON:  None for defendant.

25             THE COURT:  Number 3, burden of proof.

22-02426      Berberich v KCS_Pretrial      06.26.24      80

1          MS. HARRISON:  No objection.

2          THE COURT:  So I did not make an adequate change to my

3    stock instruction here.  I need to tweak this.  So that bold

4    statement in the bracket -- I don't know how I missed this --

5    needs to come out, and that sentence just continues with the

6    prior paragraph.

7          MS. HARRISON:  Uh-huh.

8          THE COURT:  "Defendant has the burden of proof in its

9    affirmative defense by clear and convincing evidence.  A party

10   who must prove something" -- that's all one paragraph.  And that

11   bold note is a thing -- a reminder of my stock instructions, if

12   I'm going to give it, which, obviously, I am.  So I'll make that

13   change.

14         No other objections to burden of proof, Number 3?

15         Number 4, elements of Count 1.

16         MR. THOMPSON:  Plaintiff has no objection, Your Honor.

17   However, we're going to move for a directed verdict at the close

18   of the case.  We think that it's likely to be granted on at

19   least -- some of these elements just don't seem in dispute.

20         So I generally agree with the Court's position on the

21   instruction on the elements before trial starts.  I think, here,

22   for this instruction, I would wait until the end of trial to

23   instruct on the elements.

24         THE COURT:  I apologize, counsel.  I'm not sure I

25   followed that.  What --

```
1           MR. THOMPSON:  Yeah.  So at trial's close, we're going

2    to move for directed verdict on all four of these elements.  We

3    think some of them, if not all, just aren't going to be in

4    dispute.  At least as a factual matter.  And the Court

5    decides --

6           THE COURT:  Right now, Number 1's in dispute.  And

7    therefore, Number 2's in dispute.  I don't even think

8    defendant's would agree with Number 3.  That -- I think there's

9    a dispute as to whether being assessed attendance points is an

10   unfavorable personnel action, but I think that's in dispute.

11          MR. THOMPSON:  We agree defendant disputes them.

12   However, for example, the person -- the unfavorable personal

13   action -- personnel action, the law is quite clear that even

14   noticing Mr. Berberich to an investigation is an adverse of

15   action under the FRSA.

16          The FRSA is broader than Title 7, for example.  And it

17   includes any kind of discrimination.  Including even noticing to

18   an investigation, that the railroad then dismisses, much less

19   finds them guilty and assesses points.

20          So as a legal matter, I think once the facts are in

21   evidence, this isn't going to be something that goes to the

22   jury.  For that reason, we would instruct -- I don't think these

23   elements are wrong, but I would withhold instructing on the

24   elements in this case until the close of trial.

25          THE COURT:  So you're not objecting to Instruction
```

1  Number 4, you're objecting to my intent to instruct the jury in

2  advance of trial?

3            MR. THOMPSON:  Just for Number 4, yes, Your Honor.

4            THE COURT:  Well, I'm not going to bifurcate

5  instructions and give them piecemeal.  I'm going to give them

6  instructions or I'm not.

7            MR. THOMPSON:  All right.  Then we would prefer that

8  they be instructed on the elements if that's the case.

9            THE COURT:  All right.  Defendants, any objections to

10  Instruction Number 4?

11            MS. HARRISON:  Yes, Your Honor, a few.  On the first

12  paragraph, the reference to the Federal Rail Safety Act and the

13  FRSA, we don't believe referring to the actual act by name is

14  necessary and would just confuse the jury.

15            We think that the elements are sufficient.  In order

16  for plaintiff to establish his claim, he has the burden of

17  proving by a preponderance of the evidence and would -- would

18  request the exclusion of all reference to the Federal Rail

19  Safety Act by name.

20            THE COURT:  I'm ambivalent.

21            Plaintiff, what do you think?

22            MR. THOMPSON:  I'm going to mention the FRSA, so it's

23  helpful if it's in the instructions.

24            THE COURT:  It's going to come in.  And I -- I ruled

25  on the -- on the objection to the complaint that plaintiff

1   filed, that that is going to come in as evidence.  So I assume

2   that complaint -- that -- that either the evidence is going to

3   reference the FRSA.  So how is this -- how is this inaccurate or

4   harmful or inappropriate?

5         MS. HARRISON:  Well, your Honor, it may be the case

6   that depending how the evidence comes in, that complaint may not

7   be offered by defendant.  You know --

8         THE COURT:  But even if that document's not offered,

9   it's still a complaint he made under the FRSA, right?

10        MS. HARRISON:  Yes.  Yes.

11        THE COURT:  So how is this -- I -- I agree, it's not

12  necessarily necessary, but it seems to me that far from

13  confusing the jury, it might help them focus on what we're

14  talking about.  I guess I'm not sure the reasons for your

15  objection.

16        MS. HARRISON:  Our position is that it's not --

17  although we're not moving to, obviously, exclude all reference

18  in trial to it, that it's unnecessary in the instructions

19  provided to the jury to specify that this is the Federal Rail

20  Safety Act, and that it could cause confusion --

21        THE COURT:  How would it cause confusion?

22        MS. HARRISON:  The reference to safety.

23        THE COURT:  Well, I mean, that's part of the -- first

24  of all, that's in the title of the act.  I don't think the

25  jury's going to be confused by that.

```
 1              Secondly, that's part of the whole retaliation claim
 2    that -- that apparently now plaintiff's going to have to discuss
 3    at some length, that he thought there was a safety violation and
 4    that's what he pursued.
 5              I think the jury's more likely to be confused as to
 6    what complaint we're talking about if we don't have that in,
 7    than if we do.  So I'm going to overrule that objection.
 8              MS. HARRISON:  Understood.
 9              THE COURT:  Any other objections to Number 4?
10              MS. HARRISON:  The only other objection is a request
11    that you add "and" after each of the elements.  It is specified
12    in the instructions that plaintiff has to prove each of them.
13              THE COURT:  Oh.  All right.  Well, I mean -- so is
14    this -- this isn't even, like, the Oxford comma.  Doesn't the
15    "and" usually just follow the last one?
16              MS. HARRISON:  It does, but we've seen instructions --
17    it's in the Eighth Circuit model instructions on it, just to
18    mention "and" after every one just to reinforce.
19              THE COURT:  I did have a question as I read your
20    proposed instructions.
21              MS. HARRISON:  Yes.
22              THE COURT:  You know we're in the Tenth Circuit,
23    right?
24              MS. HARRISON:  I do.  The Tenth Circuit does not have
25    model instructions.
```

```
 1              THE COURT:  The Tenth Circuit -- I tell my law clerks
 2   this all the time when they say the Tenth Circuit hasn't
 3   addressed this.  I say, you'll say that a lot in your practice.
 4   I notice that you continuingly cited the Eighth Circuit.  I
 5   thought, we're across the river, I think you know that.
 6              MS. HARRISON:  It is.  We cited that --
 7              THE COURT:  That's fine.  We'll add "ands".  It's --
 8              MS. HARRISON:  Okay.
 9              THE COURT:  We're not about grammar, we're about
10   making things clearer.  So I'm fine with that.
11              Any other objections to Number 4?
12              MS. HARRISON:  No objection.
13              THE COURT:  Number 5?
14              MR. THOMPSON:  None for plaintiff.
15              MS. HARRISON:  On 5, we object to the inclusion of the
16   refusal to work.  As stated with plaintiff's claim today, that
17   is not one of the theories that they are pursuing.
18              THE COURT:  We actually discussed this in chambers.
19   And I had -- because I was a little unclear as to what the
20   nature of plaintiff's claims were, I left it in.  But I think
21   they make a good point.  Is there a reason to keep Number 2?
22              MR. THOMPSON:  Yeah.  It's back in now because we have
23   to talk about the underlying activity where we refused to do
24   something.  Where you refused to let the engineer throw the
25   switch.  If they agree that missing work to attend the
```

86

1  Department of Labor hearing is protected activity, we don't need

2  this.  If they're going to say that he has to prove that in good

3  faith, he --

4         THE COURT:  But did he refuse to work?  I mean, he --

5  he threw the switch, and that created issues with the railway,

6  but there wasn't a refusal to work, was there?

7         MR. THOMPSON:  Yeah, there was.  Really, a refusal to

8  comply with their instructions.  They instructed him, we want

9  the engineer to throw the switch, not you.  And he said, no, I'm

10 not doing that.

11        THE COURT:  Okay.  Yep.  All right.  I think that's

12 right.  Apparently, the facts of the case have been put in, so

13 I'm going to overrule that objection.

14        MS. HARRISON:  Your Honor, if I may just provide one

15 more piece.

16        THE COURT:  All right.

17        MS. HARRISON:  The protected activity that they are

18 alleging is the participation in an investigation that they

19 reasonably believe constitute a violation of federal law.  The

20 protected activity is not the refusal to work.

21        THE COURT:  The protected activity is filing the

22 complaint.

23        MS. HARRISON:  The protected activity was

24 participating in the investigation, the DOL hearing, that he

25 reasonably believed constituted --

1          THE COURT:  And what was the DOL hearing about?

2          MS. HARRISON:  The DOL hearing was -- according to

3    him, he reasonably believed it was a violation of the FRSA

4    relating to railroad safety, but his protected activity for his

5    claim for absenteeism is not the refusal to work.

6          THE COURT:  Well, I mean this goes back to earlier

7    discussion, the retaliation does not exist in the abstract.  And

8    since defendant is not agreeing that anything he did is

9    protected, then the plaintiff has the burden to prove that he

10   was retaliated against when he had a good faith to believe was a

11   legitimate objection.  And part of his legitimate objection was

12   that it was a safety violation for the engineer and not the

13   conductor to throw the switch.

14         MS. HARRISON:  Your Honor --

15         THE COURT:  So if we have to talk about why he had a

16   good faith to believe this and why that therefore gave him

17   protected activity, we have to talk about the whole res gestae

18   of the underlying issue.

19         MS. HARRISON:  We may have to talk about it, but in

20   terms of the instruction on what can constitute his protected

21   activity here for his absenteeism claim, that protected activity

22   is not a refusal to work, it was his participation in the

23   investigation.

24         And so if we -- you know, if it comes into the case

25   and we're -- it is discussed, our position is it's inappropriate

```
 1   to include a jury instruction for the jury to find that was

 2   protected activity.

 3              THE COURT:  So are you objecting to the first sentence

 4   in the second paragraph, but not to the final sentence in the

 5   instruction?

 6              MS. HARRISON:  We are objecting to "alternatively,"

 7   down.  The first paragraph we're not objecting to.  We're

 8   objecting to the --

 9              THE COURT:  Everything after the --

10              MS. HARRISON:  Everything after that.  That the

11   protected activity that led to the absenteeism that's connected

12   with that retaliation claim could be refusal to work, when that

13   is not what he is alleging.

14              THE COURT:  Plaintiff.

15              MR. THOMPSON:  Mr. Berberich's activity of taking off

16   to attend the hearing is only protected in so far as he has a

17   subjective belief that the underlying activity was also

18   protected.  If he thinks that activity is not protected, then

19   going to the hearing is not protected either.

20              And so he's going to have to show -- if this is Kansas

21   City Southern's position, that he has to show that he engaged in

22   a good faith belief that attending the hearing was FRSA

23   protected activity.  He also has to show the underlying activity

24   he subjectively believed is protected activity.

25              THE COURT:  Well, this is murky, but since -- since
```

1    defendant's have put the whole matter in issue and don't agree

2    that anything's protected activity, I'm inclined at this point

3    to side with plaintiff's position on this.

4              That if they've got to prove the whole issue, then I

5    think they're proving that his saying, I'm not going to do that,

6    is part of the res gestae of having to prove that whole matter.

7              Again, I'm somewhat astonished at the defendant's

8    position in this hearing.  That if they're going to put it all

9    at issue, then it's going to be all at issue.  So I'm not going

10   to sustain that objection.

11             Anything else in Instruction 5?

12             MS. HARRISON:  No, Your Honor.

13             THE COURT:  Instruction 6?

14             MR. THOMPSON:  Plaintiff takes issue with

15   Instruction 6.  We don't believe it's an accurate recitation of

16   the law.

17             So the standard that applies to FRSA cases, the

18   AIR 21, under which the plaintiff must prove only that his

19   protected activity in some way contributed to the adverse

20   action.  That can include -- and for example, we tried this case

21   in the District of Colorado.  We got a verdict.  Which the Tenth

22   Circuit affirmed.

23             Where our theory of the case was, the charging

24   manager, the person who noticed him to the investigation, did

25   that out of retaliation.  The guy who ultimately decided the

1   hearing had no idea, but it's a kangaroo court hearing, so

2   everyone's found guilty.  So really, the charging decision is

3   the adverse action.

4          So the fact that the ultimate decision-maker didn't

5   know about the protected activity is totally irrelevant.  For

6   plaintiff's case.  All plaintiff has to do is -- his protected

7   activity contributed in some way to the adverse action.  At that

8   point retaliation presumed.  And what defendant has to show is

9   that it would have done the same thing even absent the protected

10  activity.

11         So as it relates here, what this case is really

12  about --

13         THE COURT:  Did you submit an instruction on this?

14         MR. THOMPSON:  We certainly did, Judge.

15         THE COURT:  Which one?

16         MR. THOMPSON:  Bear with me.  Let me pull up

17  plaintiff's early jury instructions.  It is disputed Instruction

18  Number 1, elements of the claim.

19         THE COURT:  Well, this was not a helpful instruction

20  because it was just a narrative.  And elements are usually

21  sequentially numbered.  So if that's what you're trying to say

22  in this instruction, it was not at all clear.

23         But you're saying the law is that it can be

24  retaliation, even if the person taking the adverse employment

25  action against the employee is unaware of the matter for which

1   he's being retaliated against?

2            MR. THOMPSON:  That's absolutely right under the FRSA.

3   However, it is not --

4            THE COURT:  I've never heard such a thing.

5            MR. THOMPSON:  It's not a "gotcha" statute, to be

6   clear.  All that happens is the burden shifts.  For them to

7   show, had we learned it in some other way, we would have taken

8   the same adverse action.

9            So I can talk both -- give an illustrative example

10  that would also talk about this case.  The illustrative

11  example -- one of the big issues that the FRSA was meant to

12  cover was retaliation for reporting injury.

13           And so if you have a case where a guy's not wearing a

14  glove and cuts his finger, and they then discipline him for not

15  wearing a glove.  It's not they can't discipline him for not

16  wearing the glove.  They learned of it via the injury, so it

17  clearly contributes.  All the railroad has to do is show, look,

18  we discipline everyone who doesn't wear gloves, regardless if

19  they're injured.  It's just a burden-shifting.

20           As it relates here, what the plaintiff has to show is

21  that those absences to attend the hearing contributed to the

22  charging officer charging him.

23           THE COURT:  But your example did not -- of the glove,

24  did not involve retaliation.

25           MR. THOMPSON:  Sorry.

1              THE COURT:  Retaliation, it seems to me, implies that

2    if I'm retaliating against something, I have to know what you

3    did that I'm retaliating you against for.

4              MR. THOMPSON:  I understand --

5              THE COURT:  That's not the case with the glove.  So

6    give me a different example.

7              MR. THOMPSON:  Let me better draw up that example.

8    So -- this is actually a real case.  The guy wasn't wearing a

9    glove.  Cuts his hand.  Reports the injury.

10             The railroad then says, we're going to discipline you

11   for not wearing the glove.  Which they're allowed to do, but

12   what they have to do then is show, we discipline everyone that

13   doesn't wear gloves.  In other words, if we'd seen you not

14   wearing the glove, even absent you cutting the hand, we would

15   have given you the same --

16             THE COURT:  What's your retaliation in that scenario?

17             MR. THOMPSON:  It's the discipline for not wearing the

18   glove.  He reports the injury, and says, hey, I cut my hand.

19   And they didn't say, you weren't wearing a glove, we're going to

20   discipline you for not wearing the glove.

21             THE COURT:  But that's not retaliation.

22   Retaliation -- what's the protected activity in that example?

23             MR. THOMPSON:  Reporting an injury is also a protected

24   activity under the FRSA.  That's part of what this law was meant

25   to address, is they've had a big issue with railroads finding

1    reasons to discipline people who report injures, essentially

2    manufacturing them.

3              And that's a great example.  Guys don't wear gloves

4    all the time.  So you can't just discipline the guy for not

5    wearing a glove because he happened to get injured.  You have to

6    show that you discipline everyone that doesn't wear gloves.

7              So as it relates to this case, what the contributing

8    factor standard requires, all Mr. Berberich needs to show is

9    that his absences to attend that hearing contributed in some way

10   to Kansas City Southern charging him.  He's then satisfied his

11   case.

12             That's not -- that's not a "gotcha" statute then.  The

13   burden simply just shifts to the defendant.  All it has to show

14   is, we discipline everyone who has more than ten absences.

15   Period.  If it shows that, it wins.

16             THE COURT:  Well, this is, obviously, as you

17   represented, a variance of what the normal law under retaliation

18   is.  If that is, in fact, the law, it would have been extremely

19   helpful if you would have done something more than this, sort

20   of, narrative and very sort submission of your instructions for

21   element number one to indicate that -- that that's what the law

22   is.

23             Defendants, what's your reaction to this?  Your

24   response to this because you're obviously representing the

25   railroad industries.

1          MR. THOMPSON:  Judge, may I add one more thing for the

2     Court's knowledge?

3          THE COURT:  All right.

4          MR. THOMPSON:  There has been a circuit split on how

5     this burden-shifting framework should work.  With the Eighth

6     Circuit and Seventh Circuit deciding that it includes an

7     intentional retaliation component, which also affects knowledge,

8     that -- that circuit's split was just decided by the Supreme

9     Court in *Murray versus UBS*.

10          That you do not have to show intentional retaliation.

11     Don't have to show motive.  Which, as it relates to knowledge,

12     goes back to, all we have to show is it somehow contributed.

13     Not that the final decision-maker knew and did it out of some

14     kind of animus.

15          MS. HARRISON:  Well, Your Honor, it feels like

16     plaintiff is conflating two separate instructions on

17     contributing factor and defendant's knowledge.

18          As for defendant's knowledge, Instruction 6 fairly

19     restates the Tenth Circuit's recitation of the elements of the

20     claim as put forth in the Court's verdict director on the

21     elements knowledge is an element.  And the knowledge has to be

22     the relevant decision-maker as per *Lincoln v. BNSF*.

23          As for this -- the discussion of the contributing

24     factor, I think that's a discussion for us to have in

25     Instruction Number 8, and not Instruction Number 6, as to the

```
 1   element on defendant's knowledge.
 2          THE COURT:  What's your Tenth Circuit case you're
 3   relying on, counsel?
 4          MS. HARRISON:  Yes.  We're relying on Lincoln v. BNSF.
 5   It's in our instructions.  Let me find the cite.
 6          THE COURT:  Plaintiff, you said that the Tenth
 7   Circuit's affirmed something.  What's your --
 8          MR. THOMPSON:  Fresquez, F-r-e-s-q-u-e-z, versus BNSF.
 9   And then, again, all this --
10          THE COURT:  And the citation?
11          MR. THOMPSON:  Let me pull it up for Your Honor.
12          It is 52 F.4th 1280.
13          THE COURT:  Twelve --
14          MR. THOMPSON:  Eighty.
15          THE COURT:  Eighty, eight, zero?
16          MR. THOMPSON:  Yes, sir.
17          THE COURT:  What's the BNSF case v. DOL that you cited
18   in support of your Instruction Number 1?  What does it show?
19          MR. THOMPSON:  I believe it's just that if the
20   plaintiff shows -- or the employee shows that their adverse
21   action contributed in any way.  Which, again, I understand we
22   disagree with defendant, but that affect's not the knowledge
23   component that that is all they have to prove.
24          And, again, I would emphasize that this was -- this
25   circuit's split was just resolved.  So any Supreme -- or any
```

1    appellate cases have been overruled by *Murray v. UBS*.

2         THE COURT:  And that's a recent Supreme Court case?

3         MR. THOMPSON:  It is.

4         THE COURT:  When?

5         MR. THOMPSON:  It was this year.  I will pull up the

6    cite for it.

7         THE COURT:  And what do you think it held?

8         MR. THOMPSON:  It held that you do not need to prove

9    animus, motive.  All you have to prove is -- all a plaintiff in

10   an AIR 21 case -- which is the FRSA SOX, all they need to prove

11   is that the -- their protected activity contributed in some way

12   to the adverse action.  And the burden then shifts to the

13   defendant to essentially disprove retaliation.

14        Your Honor, the cite for that -- for the *Murray* case

15   is 144 S.Ct. 445.

16        THE COURT:  And what year was that?

17        MR. THOMPSON:  2024.

18        THE COURT:  Well, plaintiff, your obligation in

19   submitting proposed instructions is, number one, to spell it in

20   detail what you think the law is.  And number two, to cite to

21   why you think that is the law.  And you wholly failed with

22   respect to these issues.

23        And the response to that is not to show up in an

24   instruction conference -- you cite a lot of cases, you make a

25   lot of arguments that you've never presented to the Court

```
 1   before.
 2          So honestly, in part, I think I could reject your
 3   positions here as being waived.  We'll look at these cases, but
 4   this is completely an inadequate way to address instructions.  I
 5   don't know what else to say.
 6          MR. THOMPSON:  I apologize for not also including it
 7   in the jury instructions --
 8          THE COURT:  And you didn't file trial brief.
 9          MR. THOMPSON:  We did not.  We included it in our --
10          THE COURT:  You just thought you'd spring all this on
11   us today.
12          MR. THOMPSON:  We -- this is the standard we included
13   in our summary judgment briefing, Your Honor.  So we thought
14   that was sufficient.  Clearly, it's not.  I apologize to the
15   Court.  That was not intentional.
16          THE COURT:  Let's move on to Instruction -- I'll look
17   at these and see what I think, but this is wholly irregular.
18          Instruction Number 7.
19          MR. THOMPSON:  Plaintiff objects to 7.  The adverse
20   action under the unfavorable personnel action under the FRSA is
21   broader than Title 7.  It includes -- you can take it straight
22   from the statute, it includes in any way discriminates.
23          THE COURT:  What's -- what's the statement of law?  I
24   mean, that's what we do in instruction conference, counsel, is
25   we spell out statements of law with respect to authority.
```

1   That's what should have happened before now.

2          And I'm -- I'm -- I'm quite flustered that you're just

3   showing up with a whole new body of law you've not bothered to

4   appoint the Court with before, that you think arrives at an

5   entirely different set of conclusions.  This is a terrible way

6   to do an instruction conference.

7          So what do you think the law is with respect to

8   adverse action?  And don't give me a general statement.  We're

9   looking for statements that would be included in an instruction,

10  a legal statement of law.  What would that be?

11         MR. THOMPSON:  An adverse action includes -- and I'm

12  quoting right from the statute here, 49 U.S.C 20109(a):

13  "Discharge, demotion, suspension, reprimand, or any other kind

14  of discrimination against an employee."

15         THE COURT:  That's exactly what Instruction Number 7

16  says.

17         MR. THOMPSON:  I apologize, Your Honor.  I misread it.

18  I apologize, you're right.  Nope, we have no objection to 7.

19         THE COURT:  Defendants.

20         MS. HARRISON:  Your Honor, defendants would instead

21  propose our adverse action instruction.  Which provides the

22  broader proposition that it's only adverse if plaintiff has

23  proven that the adverse action might discourage reasonable

24  employee for engaging in protected activity.

25         We understand the Court's position, that it wants to

1   give the language from 20109(a).  So we'll stand on our

2   objection, but we understand the Court's position.

3          THE COURT:  Let's move on to Instruction Number 8.

4   And apparently what we've been talking about, a contributing

5   factor, also relates to Number 8.  So what surprises do you have

6   for me in Instruction Number 8, plaintiff?

7          MR. THOMPSON:  The same issue, Judge.

8          THE COURT:  Which is what?

9          MR. THOMPSON:  We don't need to prove retaliatory

10  motive.

11         THE COURT:  You don't need to prove retaliatory motive

12  for retaliatory claim?

13         MR. THOMPSON:  That's correct, Judge.

14         THE COURT:  That doesn't make any sense at all.

15         MR. THOMPSON:  There are many courts that agree with

16  you, and this is what the Supreme Court resolved.  The Tenth

17  Circuit had previously held that we don't need to prove

18  retaliatory motive, again, that's the *Fresquez* case.

19         THE COURT:  Well, I mean, your claim here is

20  retaliation.  I mean, I don't know what you think the Tenth

21  Circuit earlier said you don't have to prove retaliation for,

22  but I can't believe that they said you don't have to prove

23  retaliation for a retaliation claim.

24         MR. THOMPSON:  So, Judge, I can read from the *Murray*

25  opinion out of a paragraph briefly.

1           THE COURT:  What were the issues in *Murray*?

2           MR. THOMPSON:  Whether you need to prove retaliatory

3    intent or motive.

4           THE COURT:  Who is UBS?

5           MR. THOMPSON:  UBS Securities.  This is a whistle --

6    or a SOX case.  And the FRSA adopts the standard applicable to

7    SOX.

8           THE COURT:  And what do you think *Murray* holds?

9           MR. THOMPSON:  In *Murray*, they said the Second Circuit

10   was wrong when it held that the word, quote, discriminate, end

11   quote, in the statutes catchall provision, impose an additional

12   requirement that the whistleblower plaintiff --

13          THE COURT:  You might read a little more slowly

14   because the court reporter is struggling to get this down.

15          MR. THOMPSON:  I will.  "An additional requirement

16   that the whistleblower plaintiff prove the employer's

17   retaliatory or intent or animus.  Of accepting that the word

18   discriminate is relevant to the intent inquiry, the only intent

19   that the statute requires is the intent to take some adverse"

20   action -- "adverse employment action against the whistleblowing

21   employee because of his protected activity."

22          The statute is clear that whether an employer

23   discriminated, in that sense, has to be resolved through the

24   contributing factor burden-shifting framework that applies to

25   Sarbanes-Oxley whistleblower claims.

1           THE COURT:  So first of all, it has to take -- hang

2    on.  So you said the intent the statute requires is the intent

3    to take some adverse action against the whistleblowing employee

4    because of protected activity.  Isn't that the definition of

5    retaliation?

6           The Court appears to be talking about discrimination

7    here.  I don't know what the context of this is.  I remember

8    looking at this case briefly when it came down.  Not in this

9    context.  But if they're saying the statute requires that

10   adverse action be taken against a whistleblowing employee

11   because of the protected activity, that's retaliation.

12          So how -- how do you say that that statement shows

13   that you don't need to prove retaliation motive for retaliation?

14          MR. THOMPSON:  Well, I mean, the Supreme Court clearly

15   said you don't need to prove retaliatory intent or adverse --

16          THE COURT:  They didn't clearly say it in what you

17   read to me.

18          MR. THOMPSON:  Again, Judge, I'll read from it:  "The

19   Second Circuit was wrong when it held that the word discriminate

20   in the State's catchall provision imposes an additional

21   requirement that the whistleblower plaintiff proved the

22   employer's retaliatory intent or an animus."

23          THE COURT:  That's discrimination.  That they're wrong

24   when the Second Circuit held that discrimination requires that.

25   I don't know what context you're talking about.  Discrimination

1   and retaliation are different terms.

2           MR. THOMPSON:  Not for purposes of the FRSA, Judge.

3           THE COURT:  I -- I -- I find that hard to believe.

4           MR. THOMPSON:  I understand that many judges agree

5   with you.  That's why there was a circuit split.  And that's

6   what this case resolved.  There were circuits that -- the Eighth

7   Circuit --

8           THE COURT:  This case apparently was about

9   Sarbanes-Oxley.

10          MR. THOMPSON:  It was.  Yep.  Which is adopted by the

11  FRSA.

12          THE COURT:  I -- I'm having -- I'm struggling to make

13  sense of anything that you're saying.

14          MR. THOMPSON:  All right.  So here's the full context.

15          THE COURT:  Well, this would have been really helpful

16  a couple weeks ago, counsel.  Not now.  Go ahead.  Let me hear

17  what you have to say.

18          MR. THOMPSON:  So congress enacted the FRSA due to

19  a -- essentially, a history of retaliation.  And they tipped the

20  scales in the balance in favor of employees.  So that when

21  protected activity contributes to an adverse action, frankly,

22  retaliation's presumed.  The burden then shifts to the employer

23  to disprove it.  That's what makes this fundamentally different

24  than Title 7.

25          THE COURT:  Defendant.

1           MS. HARRISON:  Your Honor, the defense agrees with the

2    Court.  We'll have to look into this case to see if it stands

3    for what they cite.  But we agree with the Court's understanding

4    of what the current Tenth Circuit requirement is, that there

5    must be a retaliatory motive.

6           We do have an additional comment on Instruction

7    Number 8.

8           THE COURT:  All right.

9           MS. HARRISON:  We would suggest that the Court should

10   include a second paragraph, which we put forth in our

11   instruction, from the *Lincoln v. BNSF* case.  That it's not

12   enough on its own, but two events occurred close in time.  This

13   mere closeness --

14           THE COURT:  Show me what -- your instructions were

15   Document Number 68?

16           MS. HARRISON:  Yes.  And it was page 7.

17           THE COURT:  Page 7?

18           MS. HARRISON:  Yes.

19           THE COURT:  All right.  I'm there.

20           MS. HARRISON:  That second paragraph:  "It is not

21   enough on its own that two events occurred close in time to one

22   another.  Mere closeness between protected activity and an

23   unfavorable personnel action does not mean the action was taken

24   out of intentional retaliation due in whole or in part to the

25   protected activity."

```
 1              THE COURT:  What is the time nexus in this case?

 2              MS. HARRISON:  The hearing occurred in May of 2022,

 3    and the points were assessed in June.  So one month.

 4              THE COURT:  So this sounds like closing argument to

 5    me.  This second paragraph in your -- well, you don't number

 6    them.  You're proposed instruction of retaliation requirement.

 7              They were a month apart.  You can argue that there was

 8    some other reason for that, but this sounds like closing

 9    argument, not an instruction on the law.

10              MS. HARRISON:  Understood, Your Honor.  We will argue

11    it.

12              THE COURT:  Yep.  I think that's fine.

13              MR. THOMPSON:  Your Honor, on -- on the issue that

14    plaintiff has raised, I'll also point out that in our

15    response -- or objections to defendant's proposed instructions,

16    we argued exactly what we're arguing now.

17              If you look at page 2 of Docket 71.  Also page 6 of

18    Docket 71.  We are -- we tried to make clear to the Court that

19    intentional retaliation or animus or anything of those things

20    are something plaintiff need not prove.

21              THE COURT:  Well, page 1, of whichever you're reading

22    now, says that you're arguing that it's contributed to.  But

23    then you conclude by saying, therefore -- "because his protected

24    activity could have contributed to KCS taking adverse action" --

25    "even if a manager who assessed points against him is
```

1   interested" -- "was ignorant of his protected activity" -- that

2   sentence was nonsense to me.

3           That it couldn't contribute to something if the actor

4   was unaware of it.  And I -- I read your argument saying that

5   the standard should be contributed to, but you say it could

6   contribute to, even if the actor's unaware of it.  That makes no

7   sense.  Because if the actor's unaware of it, there's no way

8   that the activity could have contributed to the action.

9           MR. THOMPSON:  So, again, the example in *Fresquez*

10  is -- or you could take -- you can hear his example.  If the

11  charging officer is aware of the protected activity, and says,

12  I'm going to notice you to investigation, and that investigation

13  always results in a person being found guilty -- it's just a

14  kangaroo court.

15          THE COURT:  Let's -- let's -- let's avoid the

16  hysterics here and the loaded language.

17          MR. THOMPSON:  Sure.

18          THE COURT:  This is the third time you've referenced

19  the kangaroo court.  That's not -- there's no jury here to

20  impress with your emotional arguments.  Let's just try to make

21  factual statements.

22          MR. THOMPSON:  Fair enough, Judge.

23          If the charging officer is aware of the protected

24  activity and they notice me to investigation, whatever the

25  decision-maker does, the -- my protected activity has

1    contributed to the adverse action.

2            THE COURT:  Well, your -- your protected activity

3    contributed when they noticed you for an investigation.  And the

4    person who noticed you for the investigation was aware of your

5    protected activity.

6            MR. THOMPSON:  That's right.

7            THE COURT:  So your statement that the person who took

8    adverse action doesn't have to be aware of the contributing

9    activity --

10           MR. THOMPSON:  Someone --

11           THE COURT:  Doesn't have to be aware of their

12   protected activity, is not relevant to the hypothetical you just

13   gave me because the person who noticed you for the hearing was

14   aware of the protected activity.

15           MR. THOMPSON:  Sure.  But it's a different manager who

16   reviews the transcript from that hearing and makes a decision.

17           And so even -- regardless of whatever he decides or

18   whether he knows about my protected activity, my protected

19   activity contributed to whatever he does.  Because I wouldn't

20   have been noticed to an investigation in the first place if I

21   hadn't engaged in it.

22           THE COURT:  None of this makes sense to me, candidly.

23   This may be the most frustrating instruction conference I've

24   ever been in because -- I actually told my law clerk at the time

25   that I didn't think the proposed instructions were at all

1    helpful.  And I didn't realize how true that statement was.

2           Is there anything else we can talk about in

3    Instruction Number 8?

4           MR. THOMPSON:  No, Judge.

5           MS. HARRISON:  No, Your Honor.

6           THE COURT:  Number 9?

7           MR. THOMPSON:  No objections.

8           MS. HARRISON:  Your Honor, defendant would propose its

9    own instruction on this, but we understand the Court's position.

10   And so if the Court prefers this instruction, we understand.

11          THE COURT:  Is there any way in which you think this

12   instruction is an erroneous standard of the law?

13          MS. HARRISON:  We believe that it overstates the

14   statement that no evidence of monetary value of such intangible

15   things, as pain and suffering, has been or need be introduced

16   into evidence is unnecessary and can be argued.

17          THE COURT:  Well, plaintiff is only claiming emotional

18   damages.

19          MS. HARRISON:  Yes.  Yes.  The statement that he

20   doesn't have to have evidence of the monetary value of the

21   intangible things, our position is that's an unnecessary

22   statement.  But we understand the Court's position and don't

23   wish to belabor it.  We'll object for the record.

24          THE COURT:  All right.

25          Plaintiff.

1          MR. THOMPSON:  No objection to any of the remaining

2    instructions, Your Honor.

3          THE COURT:  To any of the remaining instructions?

4          MR. THOMPSON:  Not for plaintiff.

5          THE COURT:  Number 10.  Defendant.

6          MS. HARRISON:  Your Honor, defendant -- as we've

7    mentioned earlier, defendant objects to the giving of the

8    punitive damages instruction at all.  We understand the Court

9    has already ruled on that --

10         THE COURT:  That issue has not been resolved prior to

11   trial.

12         MS. HARRISON:  Yes, we understand.

13         THE COURT:  A Rule 56 motion would have been a great

14   time to have done that, but you all elected not to do that.

15         MS. HARRISON:  Yes.

16         THE COURT:  So how is this -- given the status that

17   this case is in right now, how is this statement an erroneous

18   statement of the law?

19         MS. HARRISON:  It is not an erroneous statement of the

20   law.  However, we do believe the third paragraph that starts

21   with, "however, you may not award punitive damages," will not

22   reflect the evidence that comes in.  We think it's an

23   unnecessary statement from what defendant anticipates

24   introducing into evidence.

25         THE COURT:  Well, that -- as I've already discussed,

1    the evidence that comes in is addressed at the end of trial or

2    under Rule 56.  And we're not at either of those points right

3    now.

4              MS. HARRISON:  Yeah.

5              THE COURT:  So if you think that's not going to

6    address the evidence that comes in, then we can address this

7    after the evidence has come in.  But for our purposes right now,

8    what's your position?

9              MS. HARRISON:  Well, our position is it's slightly

10   different than in other circumstances because the third

11   paragraph talks about evidence defendant would introduce.  And

12   we don't intend to introduce this evidence.  If the Court would

13   prefer to resolve at the end of the trial, we understand.

14             THE COURT:  Well, this is a safe harbor provision,

15   this third paragraph.

16             MS. HARRISON:  Yes.

17             THE COURT:  That -- that -- as almost an affirmative

18   defense, the defendant can put in evidence that we had policies

19   in place to prevent this kind of thing.  If you don't intend to

20   introduce those, then we can strengthen a third paragraph.

21             MS. HARRISON:  Yes.  We don't intend to introduce

22   those.  It's not on our evidence -- on our exhibit list.

23             THE COURT:  All right.  Well, we'll strike that third

24   paragraph.

25             I will note, we had an issue between my instructions

1   and your proposed as to the burden of proof.  And in federal

2   law, it is a preponderance, it's not a clear and convincing

3   standard.  So that's a variance from what you all proposed.

4            MS. HARRISON:  Yes.

5            THE COURT:  What else do you want to raise up

6   regarding Instruction Number 10?

7            MS. HARRISON:  Nothing.  And the only remaining

8   objection we have is on something on Instruction 18.

9            THE COURT:  All right.  Well, let's just jump there.

10  Okay.

11           MS. HARRISON:  The second paragraph talks about

12  responsibility for negligent act or omission of its agent.

13  Negligence isn't an issue in this case.

14           THE COURT:  Well, you're correct on that.  That second

15  paragraph should come out.

16           MS. HARRISON:  We have no further objections to the

17  Court's instructions.

18           We do have -- the Court said you would address, if we

19  had potential additional instructions, but I could wait --

20           THE COURT:  Let's take those up right now.

21           MS. HARRISON:  The KCS would propose an instruction on

22  mitigation of damages.

23           THE COURT:  Well, I saw that you proposed that in your

24  proposed instructions.  Given that the plaintiff is only seeking

25  emotional damages, how would he mitigate that?

1          Mitigation usually comes up in terms of either

2    employment or, somewhat rarely, in injury-related cases, where

3    they took no action to address their injury.  What would

4    mitigation on the types of damages the plaintiff is claiming be?

5          MS. HARRISON:  Our position is if plaintiff is going

6    to argue that the noticing of the action was a protected

7    activity that caused emotional distress damages, testimony will

8    be that if an employee provides substantiation or a note or a

9    doctor's note or attorney's note at the time they take off,

10   those days are never counted against them.

11         So therefore, to the extent he suffered any emotional

12   distress damages for getting assessed those days for

13   participating in the hearing, they are the result of his own

14   conduct.

15         THE COURT:  But if we get into that, don't we get into

16   the FMLA claims?

17         MS. HARRISON:  No.  These are if he would have

18   provided the attorney note that he eventually provided at the

19   hearing, excusing him for those days.  That were eventually not

20   counted against him.

21         The testimony will be if he would have provided that

22   when he needed to miss the days back when they first occurred,

23   those days would not have been accounted against him.

24         And if --

25         THE COURT:  You're talking about the two days or the

 1   other 12?

 2            MS. HARRISON:  The two.

 3            THE COURT:  But notwithstanding your refusal to

 4   stipulate to those, you're also saying those two days aren't

 5   particularly relevant.

 6            MS. HARRISON:  Our -- it's not that they are not

 7   relevant.  If -- if -- our position is that the -- the noticing

 8   of an investigation itself is not protected activity.  Plaintiff

 9   has indicated they are going to argue, as soon as he received

10   that notice with 14 days, that that was a protected activity

11   that caused him emotional distress.

12            And those four -- those 14 days included two days that

13   would not have been counted if he would have provided an excuse.

14   Not because it's protected activity, but because by the standard

15   procedures that Mr. Neel follows when he counts days, you do not

16   count days that have an excuse.

17            THE COURT:  But you're only saying that's relevant to

18   the two days?

19            MS. HARRISON:  Yes, those two days.

20            THE COURT:  So what difference would that make?

21   Because your position is, we didn't count the two days anyway.

22   So if you didn't count them for one reason or you didn't count

23   them for two reasons, what difference does that make?

24            MS. HARRISON:  Plaintiff is going to argue that they

25   were, in fact, counted.  So although defendant's position is

1   they weren't, to the extent plaintiff is arguing to the jury

2   that those two days were included in the consideration, the fact

3   that they were ever counted at all prior to the investigation is

4   because of plaintiff's actions.

5          THE COURT:  Well, with respect to mitigating damages,

6   that's a pretty ethereal argument.  I'm not going to instruct on

7   that.  I think that's -- that's too vaporous.

8          MS. HARRISON:  Understood.

9          THE COURT:  What other arguments or instructions do

10  you object to not being intuitive?

11         MS. HARRISON:  No others.

12         Your Honor, in terms of preserving the record, do you

13  want us to refile the mitigation instruction or anything else?

14         THE COURT:  No.

15         MS. HARRISON:  Okay.

16         THE COURT:  I think your objection here on the record

17  is sufficient for that.  Particularly, since you've already

18  submitted that instruction.

19         MS. HARRISON:  Understood.

20         THE COURT:  Are there any objections to the verdict

21  form?

22         MS. HARRISON:  Yes, Your Honor.  We would submit our

23  proposed verdict form, which pulls from the Eighth,

24  acknowledging that the Eighth is not the Tenth Circuit, as a

25  better recitation of the elements of the claim --

1          THE COURT:  Your verdict form is extremely brief, and

2     it didn't walk through what I thought were the necessary steps

3     the jury needed to take.  Even without the recent

4     burden-shifting arguments that plaintiff has interposed.  I

5     didn't think it walked through the necessary steps of -- well,

6     as I've laid it on my verdict form.  Your verdict form has two

7     questions.

8          MS. HARRISON:  Yes.  And we -- we submit that the

9     simplicity of that form is going to be easier for the -- for the

10    jury, but in terms --

11         THE COURT:  Well, it may be easier, but I don't think

12    it accurately reflects the status on the law on the questions

13    they have to raise.  Particularly, not as I've proposed to

14    instruct them.

15         MS. HARRISON:  With that in mind, Your Honor, and

16    going from the Court's verdict form, we would suggest that on

17    question 3, "what amount of money do you award for compensatory

18    damages," should be, "what amount of money, if any."

19         THE COURT:  I'll adopt that.

20         Any other instructions on the verdict form?

21         MS. HARRISON:  On Instruction 1 -- and this may go to

22    what we've been talking about -- there's no knowledge

23    incorporated into this:  "Did plaintiff prove by preponderance

24    that he engaged in protected activity that" -- KCS is -- "that

25    the decision-maker was aware and that such activity was a

```
1    contributing factor."
2           THE COURT:  Well, that gets to the whole contributing
3    activity issue, which I've been discussing with plaintiff's
4    counsel.
5           MS. HARRISON:  Yes.
6           THE COURT:  And I'm not sure where I'm going to end up
7    there.  But at least my understanding -- well, as of a half an
8    hour ago, my understanding would have been that knowledge was a
9    necessary factor or necessary competitor of contributing factor.
10   Which I suppose is an issue for argument more than anything
11   else.
12          But -- but at least my understanding of the law would
13   have been that for it to be a contributing factor, the person
14   who is taking the adverse action obviously had to know that --
15   or the person who's taking the retributive action obviously had
16   to know the protected activity, or else the protected activity
17   could not have contributed to the retributive action.
18          MS. HARRISON:  We agree that they're related.  We
19   simply would request that they be separated out because the
20   Tenth Circuit has listed them as separate elements in the
21   Lincoln v. BNSF case.  That knowledge was the second element.
22   And the third is the contributing factor, even though they are
23   related.  And then fourth, if we're going to list the elements,
24   that it's -- that this was an adverse employment action.
25          THE COURT:  So I do that in Instruction Number 4,
```

1    which is the elements instruction.  Knowledge is an element in

2    Number 2, the second element in Instruction Number 4.

3            MS. HARRISON:  Yes.  We -- it -- our position is just

4    in the verdict form, it combines -- it omits knowledge as a

5    separate factor, even though it's listed as a separate factor.

6            THE COURT:  Well, I typically -- when I instruct on a

7    claim that has several elements, I then don't, in the verdict

8    form, repeat all of those elements.  I tell them in the

9    instructions, here's what you've got to prove to find that he

10   established his claim.  And so the elements instruction tells

11   them what they have to approve.  I don't relist all of those

12   elements in the verdict form.

13           MS. HARRISON:  I understand, Your Honor.  And that

14   makes sense to us.  We would ask that rather than say, "in

15   defendant's decision to assess attendance points against him,"

16   which presumes adverse action, that the jury actually have to

17   affirmatively say that he suffered an adverse employment action.

18           THE COURT:  It doesn't -- the verdict form doesn't say

19   that it was an adverse employment action.  It says, "defendant

20   assessed attendance points against him."  And that's a

21   factual -- non-disputed factual matter, right?

22           MS. HARRISON:  It is a non-disputed factual matter,

23   but it is in an element for plaintiff to prove that the

24   assessment of points is an adverse employment action.

25           THE COURT:  Again, I'm not going to recite all of the

1   individual elements of a claim in the verdict form.  I never do

2   that.  I tell the jury to look at the elements instruction to

3   arrive to the verdict.

4           What you're asking me to do is to repeat all of

5   Instruction Number 4 and question 1 on the verdict form.  I just

6   don't do that.  I've never done that on a verdict form.

7           MS. HARRISON:  I understand.  And I think I've made

8   our record for our objection.

9           THE COURT:  All right.  Your objection is preserved,

10  but overruled.

11          What other objection do you have in the verdict form?

12          MS. HARRISON:  Yeah.  On Number 5, we would request

13  that come out because you took that out of the punitive

14  instructions since defendant does not intend to offer evidence.

15          THE COURT:  Oh, yes.  All right.  Number 5 should come

16  out.

17          MS. HARRISON:  Nothing else.

18          THE COURT:  I agree.

19          MS. HARRISON:  No other objections.

20          THE COURT:  Anything else we need to talk about -- let

21  me rephrase that, anything else that we can talk about with

22  respect to instructions or the verdict form today?

23          MR. THOMPSON:  None for plaintiff, Your Honor.

24          MS. HARRISON:  None for defendant.

25          THE COURT:  I have here a note from defendant to look

1   at -- and they cited this in their instructions, the *Lincoln v.*

2   *BNSF* case.  And from plaintiff, to look at the *Fresquez v.* -- I

3   guess also *BNSF*.  And the *Murray v. UBS* case.  Which I don't

4   recall you cited in your instructions to us.

5           MR. THOMPSON:  I did not, Judge.  We think *Fresquez* is

6   consistent with *Murray*, but --

7           THE COURT:  Did you cite *Fresquez*?

8           MR. THOMPSON:  Yes.

9           THE COURT:  All right.  Well, I'm going to have to

10  look at those three cases.  I'll tell you, candidly, counsel,

11  that at this point, I'm skeptical of my ability to instruct at

12  the start of trial.  We have too many open issues that we need

13  to resolve.  We'll have to look at.

14          We're not meeting again until the morning of trial.

15  And I don't know how I can resolve those issues, and have 15

16  copies of instructions, or whatever the number is, ready to go

17  shortly thereafter.  And I think that so many of the objections

18  that y'all have raised depend on the evidence that's coming in.

19          Both of you appear to be highly confident you're going

20  to win this case on directed verdict.  I'm certain that at least

21  one of you is wrong.  So I'll just note it now.

22          We'll look at these and address them, but I'm, at this

23  point, inclined to think that my preference to instruct at the

24  start of trial is hopelessly doomed.  So we might not be able to

25  do that.  We'll look at these cases and try to communicate with

1  you as best we can, but I don't know what else I can say at this

2  point.

3          Is there anything else we need to take up regarding

4  this pretrial matter?

5          MR. THOMPSON:  Not from plaintiff, Your Honor.  Thank

6  you.

7          MR. DALGLEISH:  Nothing substantive, Your Honor.  I

8  would just say we will try to resolve this -- this loose issue

9  today, and so advise the Court.  Which might help on the

10  motion --

11          THE COURT:  That's going to, obviously, address a lot

12  of the instruction issues as well.  So, yes, to the extent you

13  can address that, that would be helpful.

14          MR. DALGLEISH:  We will try to do that.

15          THE COURT:  Let us know.  All right.  Court's in

16  recess.

17      (Proceedings adjourned.)

18

19                    CERTIFICATE

20    I certify that the foregoing is a true and correct

21  transcript from the stenographically reported proceedings in the

22  above-entitled matter.

23    DATE:  December 5, 2024

24                    /s/Kristina L. Scott
                       KRISTINA L. SCOTT, CCR, CRR
25                    United States Court Reporter